**Laura Ann VERMEULEN, Plaintiff–Appellant,**

v.

**RENAULT, U.S.A., INC., et al., Defendants,**

**Regie Nationale Des Usines Renault; Defendants–Appellees.**

**No. 91–8765.**

United States Court of Appeals, Eleventh Circuit.

March 22, 1993.

---

Dennis T. Cathey, Cornelia, GA, Benjamin S. Williams, Williams & Henry, Atlanta, GA, for plaintiff-appellant.

M. Diane Owens, Long, Weinberg, Ansley & Wheeler, Atlanta, GA, for defendants-appellees.

Before KRAVITCH and DUBINA, Circuit Judges, and RONEY, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

Like the Phoenix rising from the ashes, this case returns for us to address once again the district court's dismissal of appellant Vermeulen's claims for lack of personal jurisdiction. This panel previously rendered an opinion reversing the district court, *Vermeulen v. Renault U.S.A., Inc.,* 965 F.2d 1014, *amended by,* 975 F.2d 746 (11th Cir.1992), but our mandate has not yet issued. Now, we again modify our opinion, reversing the district court, although on grounds different from those stated in our previous opinion. Accordingly, we substitute for our earlier opinion the following revised opinion.

**1.** The agreements executed between Renault and AMC/AMSC include: a "Distributor Agreement," R3–34–Ex.A; a "Built–Up Sales Agreement," R3–34–Ex.B; and a "Master Agreement," R3–34–Ex.E. These agreements contemplated several different commercial arrangements between the parties, including the manufacture of

REVISED OPINION

I.

On February 16, 1988, Laura Ann Vermeulen suffered an accident while driving her 1982 Renault LeCar near Lawrenceville, Georgia. She sustained a spinal injury that left her a quadriplegic. Vermeulen had purchased the car in January 1988 from her brother. At the time of the purchase, both siblings were residents of North Carolina. Shortly thereafter, but prior to the accident, Vermeulen moved to Georgia.

Appellee Regie Nationale Des Usines Renault (RNUR or Renault), the manufacturer and designer of the 1982 LeCar, is a corporation wholly owned by the French government.

A.

In 1979, RNUR entered into a series of commercial agreements with American Motors Corporation (AMC) and its wholly owned subsidiary, American Motors Sales Corporation (AMSC), pursuant to which AMSC agreed to act as the exclusive marketer and distributor of Renault automobiles in the United States.[1] It is undisputed that AMSC distributed the 1982 Renault LeCar at issue in this case under this distribution arrangement. The stated goals of the agreements between RNUR and AMC/AMSC were, among other things, "to promote the widest distribution of Renault products," and to "develop a dealer network for Renault products in the [United States]." R3–34–Ex. A, at 1. Accordingly, AMSC agreed to purchase Renault vehicles, including LeCars, in France from RNUR, and to import them for resale in the United States.

Although the distribution agreement indicated that AMSC would take full responsibility for marketing and distributing Renault vehicles in the United States, *id.* at 4,

Renault cars at AMC's American plants and Renault's European distribution of AMC vehicles. Thus, the distribution arrangement between AMSC and Renault regarding the United States market was only one aspect of a wide-ranging alliance created by the parties through these agreements.

the parties contemplated that Renault would be fully involved in decisions affecting the sales of its product. AMSC covenanted to "use its best efforts to carry out the Market Representation Plan." *Id.* at 6. This plan, not itself part of the record but referenced and defined in the Distributor's Agreement, was a "mutually agreed upon plan, initialled on behalf of the parties [to the Distributor Agreement], for the franchising of Dealers to sell Renault products within the [United States]." *Id.* at 3.

The Distributor's Agreement also provided that "Renault may from time to time advise [AMSC] of suggested retail prices for Renault vehicles." *Id.* at 6. Further, the Built–Up Sales Agreement indicated that "[t]he estimated quantities of Renault Products to be purchased and sold hereunder during any Contract Year shall be mutually agreed." R3–34–Ex.B, at 2.[2]

Although the Distributor Agreement provided that AMSC would take responsibility for maintaining "a sufficient number of trained and competent personnel" and for instructing such personnel concerning the preparation, servicing and repair of Renault products, it also stated that RNUR would "use its best efforts to provide [AMSC] with suitable assistance in connection with [such] training and instruction responsibilities." R3–34–Ex.A, at 7–8.

Article VII of the Distributor Agreement contemplated that AMSC would maintain responsibility for "determining assortments, minimum quantities, geographical distribution and other matters relating to" parts and accessories offered for sale by Renault pursuant to the Sales Agreements entered into by the parties. The Distributor's Agreement provided, however, that AMSC would "discuss such matters with Renault and give serious consideration to Renault's recommendations." *Id.* at 8.

Article IX of the Agreement stated that AMSC "shall print such business forms, bearing Renault trademarks and Renault trade names, for exclusive use in its 'Renault' business as Renault and [AMSC] shall mutually agree," and that AMSC would "cause each Dealer ... to maintain such portions of its facilities as are dedicated to product identification and signage in conformity with Renault standards and as mutually agreed." *Id.* at 10.

Under Article X of the Agreement, Renault retained the full and exclusive right to and ownership of the "Renault" trademark. The Agreement provided that "[a]ny particular use of any [Renault] trademark which, in the sole judgment of Renault, is inconsistent with the image or goodwill of Renault or its business, advertising or public relations policies, will be discontinued immediately after the same comes to the attention of Renault if Renault so notifies [AMSC]." *Id.* at 11.

Although Article XI of the Agreement provided that AMSC would retain full and exclusive responsibility for advertising, promoting and merchandising Renault products, AMSC covenanted to "work closely with Renault in the planning and developing of themes and strategy and the related budget"; to "build upon the Renault name and image as the manufacturer and designer of outstanding small cars"; and to "verify the technical content of any representation concerning Renault Products." *Id.* at 12. Article XI continued:

> [AMSC] shall not publish or permit to be published any advertising material relating to Renault Products which is likely to mislead or deceive the public or to impair the image or good will of Renault or the reputation of Renault Products. If Renault notifies [AMSC] that any advertising is injurious to Renault's business, or is likely to mislead or deceive the public, or is at variance with the business, ad-

---

**2.** RNUR contends that AMSC had sole responsibility for determining the quantity and type of vehicles to be purchased from RNUR. Brief of Appellee at 22. When, as in this case, however, the district court has not conducted an evidentiary hearing, and the evidence presented by the parties' affidavits and deposition testimony conflicts, the court must construe all reasonable inferences in favor of the plaintiff. *Delong Equipment Co. v. Washington Mills Abrasive Co.,* 840 F.2d 843, 845 (11th Cir.1988); *Morris v. SSE, Inc.,* 843 F.2d 489, 492 (11th Cir.1988). Therefore, we accept as true plaintiff's allegation that RNUR was fully involved in determining the quantity of cars to be purchased by AMSC from Renault.

vertising or public relations policies of Renault, or is likely to impair the image or good will of Renault, [AMSC] agrees to discontinue immediately any such advertising.

*Id.* at 13.

In Article XII, AMSC agreed to appoint AMC/Renault dealers in accordance with the Market Representation Plan discussed above and undertook to "use its best efforts to assure that Dealers will comply with all sales and service manuals that Renault may from time to time issue relating to the sale and servicing of Renault Products and other matters covered by this Agreement or the Dealer Franchises." *Id.* at 14. Article XII also stated that "any dealership or dealerships operated by [AMSC] for the sale of Renault Products at retail shall at all times satisfy the standards for Renault dealerships prescribed by this Agreement, the Dealer Franchises and the sales and service manuals that Renault may issue from time to time relating to Dealers." *Id.* AMSC was responsible for the actual appointment, training and termination of such dealers. *Id.* at 13.[3]

Under Article XIII, Renault warranted its products to AMSC. *Id.* at 14. Although AMSC warranted the product to the ultimate consumer, Renault covenanted to reimburse AMSC "for warranty work performed by [AMSC] itself or by Dealers within [the United States] with respect to Renault vehicles sold therein." *Id.* at 15. Article XIII also provided that RNUR would hold harmless and indemnify AMSC against any judgment resulting from lawsuits commenced against AMSC seeking damages for alleged design or other defects in Renault products, and permitted Renault to take over the defense of any such lawsuit if Renault so chose. *Id.* at 17–18.

Article XV of the Agreement required AMSC to provide RNUR on a regular basis with certain reports and records pertaining to the distribution of Renault products. AMSC was required to provide Renault with (1) a monthly written analysis of its inventories of Renault products; (2) thrice-monthly reports of the then-current dealer stocks of Renault vehicles and the sales of Renault vehicles during the preceding 10-day period; (3) a quarterly report of all Dealer Franchise Agreements entered into during the preceding quarter, a list of all terminations of dealers during that quarter, and an opinion report assessing the impact of such new franchises and terminations on the Market Representation Plan. *Id.* at 28. AMSC also agreed to "furnish to Renault such written reports of compliance with the Market Representation Plan, and such marketing and customer satisfaction reports, as Renault may from time to time reasonably request." *Id.* at 29.

Finally, Article XVI of the Agreement stated explicitly that "[t]his Agreement does not constitute [AMSC] the agent or legal representative of Renault for any purpose whatsoever." *Id.* at 29.

The Master Agreement between Renault and AMC, R3–34–Ex.E, also contained certain provisions relevant to the new distribution arrangements between RNUR and AMC/AMSC. Prior to 1979, Renault U.S.A., RNUR's wholly-owned American subsidiary, had acted as RNUR's distributor in the United States. Under Section 4(c) of the Master Agreement, Renault agreed to cause Renault U.S.A. to transfer all its capital stock in several of the latter's distribution subsidiaries to AMC, and to cause Renault U.S.A. to sell to AMC certain inventories held by those subsidiaries or by Renault U.S.A. itself. R3–34–Ex.E, at 10–11.[4] The Master Agreement also provided that "AMC will cause [AMSC] to fulfill all the obligations and responsibilities of Renault's distribution subsidiaries as distributors under the terms of the Renault dealer franchises in effect at the respective times of the transfers.... In ac-

---

**3.** The "Dealer Franchises," as defined in the Distributor Agreement, were "Renault Dealer Franchise Agreement[s]" drafted by the parties, a sample of which was attached to the Distributor Agreement as Annex A–1.

**4.** Renault U.S.A. continues to exist today, but does not play a role in the distribution of Renault products in the United States. Renault U.S.A. played no role in the distribution of the 1982 Renault LeCar at issue in this case.

cordance with its franchising procedures, [AMSC] will also offer to reenfranchise ... dealers who are parties to a franchise with any such subsidiary at such times of transfer, provided such dealers are desirous of the same." *Id.* at 12–13. Finally, Section 4(c) provided that "AMC will offer employment on its customary terms to those officers and employees of Renault U.S.A. heretofore agreed upon by Renault U.S.A. and AMC." *Id.* at 13.

Section 4(e) of the Agreement created a "Policy Committee" consisting of equal numbers of "senior executives" from each company. This committee was charged with the responsibility "for reviewing the matters contemplated by this Agreement, and for recommending solutions to policy conflicts that may arise between them in connection therewith." *Id.* at 15. Section 4(e) also stated that "no decision shall be taken by either party with respect to the image or product positioning of the products of either party except by mutual agreement." *Id.*

### B.

Implementation of the new alliance between RNUR and AMC/AMSC took many forms. First, through a number of financial agreements, RNUR invested significant amounts of capital into AMC. Between the years 1979 and 1984, RNUR committed $545,100,000.00 to AMC through various stock, warrant, and debenture purchases. R2–27–Ex.6, at 28.[5] Under these agreements, Renault gained the right to "place certain limitations on the future incurrence by [AMC] of secured indebtedness for borrowed money and [limit] the use of the proceeds of the sales pursuant to the agreement." R2–27–Ex.3, at 29. As a result of this financial commitment, AMC was able to negotiate a new five-year bank credit agreement for an additional $250 million. R2–27–Ex.3, at 5. Ultimately, Renault came to own 46.4% of AMC's capital

stock, and to hold options on AMC stock that could make RNUR the majority stockholder in AMC. R2–27–Ex.2, at 2. RNUR's investments in AMC were crucial to the latter's health and future prospects during the economically unstable early 1980s. R2–27–Ex.2, at 1; –Ex.3, at 2.

Second, AMC and RNUR agreed to the "expansion of domestic wholesale financing available to the Company's AMC, Jeep and Renault dealers, the financing of fleet sales and the making of capital loans to dealers to whom wholesale financing is also provided," with an eye toward "establishing a full-service financial company, to support AMC, Jeep and Renault sales in the U.S. and Canada." R2–27–Ex.2, at 18. This financial company, dubbed American Motors Financial Corp. (AMFC), was ultimately formed pursuant to a joint venture between AMC and Renault Credit Internationale S.A. (RCI), a wholly-owned subsidiary of RNUR. RCI held a 50% interest in AMFC, which operations were later expanded to include retail financing as well as dealership financing. R3–34–Ex.C, at 2–3; –Ex.D, at 6–7.

Third, RNUR also reimbursed AMC for launch costs, marketing, and other operating programs in the amounts of more than $6 million in 1980, more than $22 million in 1981, more than $91 million in 1982, and more than $28 million in 1983. R2–27–Ex.4, at 21; –Ex.5, at 26.

Throughout this time period, RNUR maintained several seats on the AMC Board of Directors, although not on the AMSC Board. *See, e.g.,* R2–27–Ex.2, at 47; –Ex.3, at 40; and –Ex.4, at 30. Further, Renault U.S.A. or RNUR would send its executives to work in key positions in AMC or AMSC. Deposition of Richard Willman, at 15. Renault U.S.A. leased these employees to AMC, but retained them on its own account. *Id.* at 18.[6]

---

5. For a complete chronology and discussion of these financial transactions, see R2–27–Ex.2, at 28; –Ex.3, at 4–5; –Ex.4, at 21–22; –Ex.5, at 22–23; and –Ex.6, at 26–27.

6. During this time, several members of AMC's management team, including Jose Dedeur-

waerder, AMC's President from 1982–1984 and CEO in 1985 and 1986, were former employees of Renault. *See, e.g.,* R2–27–Ex.3, at 2; –Ex.7, at 3.

The actual process of sale and resale of Renault vehicles in the United States took the following course: as noted above, AMSC purchased the Renault vehicles in France and exported them to the United States; the decision as to where in the United States to send the Renault vehicles rested with AMSC. R1–23–Ex.A. Renault officials met several times yearly, and engaged in frequent conversations by phone, with representatives from AMC/AMSC regarding the production, distribution, and promotion of Renault vehicles. Deposition of Richard Everett, at 16, 20. During these meetings, the participants from both companies exchanged ideas regarding volume forecasts, monthly projections for orders, changes in vehicle specifications, and marketing strategies. *Id.* at 21, 24. This exchange of ideas resulted in modifications of Renault vehicles designed to accommodate the American market. *Id.* at 45–47. RNUR built those vehicles bound for the United States in conformance with federal regulations governing automobile production in this country. *Id.* at 17. RNUR was aware of the number of Renault dealerships in the United States; RNUR officials from time to time toured these dealerships. *Id.* at 35.

### C.

As of December 1980, there were 1302 Renault franchised dealers in the United States. R2–27–Ex.2, at 3.[7] These dealerships, as well as all other Renault dealerships in the world, were listed as part of the "Renault Network" in a pamphlet found in the glove compartment of Vermeulen's LeCar. This pamphlet, dated March 1981 and bearing the Renault trademark, stated that Renault's "16,800 Branches, Distributors and Dealers throughout the world are just like helpful neighbors, being qualified and equipped to offer the motorist all the services he re-

quires for driving with peace of mind." Everett Depo., Ex.1.[8]

RNUR profited immensely from its alliance with AMC/AMSC. In 1980, RNUR led all auto manufacturers in import sales improvement with a 34% increase over 1979 volume. R2–27–Ex.2, at 3. RNUR led in the same category in 1981, increasing its import sales 22% over 1980 volume. R2–27–Ex.3, at 2. Renault sold more than 37,000 vehicles to AMSC in both 1980 and 1981, more than 50,000 vehicles in 1982, and more than 40,000 vehicles in 1983, earning over $1.3 billion dollars as a result of purchases of Renault cars, components, and service parts during that four-year period. R2–27–Ex.4, at 21; –Ex.5, at 26. Sales of LeCars comprised a large percentage of these import sales. *See, e.g.,* R2–27–Ex.3, at 8. In 1984, the United States was the largest market for Renault sales outside of France. R2–27–Ex.6, at 14.

### II.

On April 18, 1989, Vermeulen filed suit in the Superior Court of Fulton County, Georgia against RNUR, Renault U.S.A.,[9] and Jeep Eagle Sales Corporation (Jeep Eagle), the successor to AMC. Vermeulen alleged that the injuries she suffered in the February 16, 1988 accident were the result of the negligent manufacture and design of the LeCar's passenger restraint system. The defendants removed the case to the United States District Court for the Northern District of Georgia, asserting diversity of citizenship as their source of federal subject matter jurisdiction. *See* 28 U.S.C. § 1332. RNUR then moved to dismiss the case against it for lack of personal jurisdiction. *See* Fed.R.Civ.P. 12(b)(2).

The district court granted RNUR's motion to dismiss without conducting an evidentiary hearing on the issue. *Vermeulen v. Renault U.S.A., Inc.,* No. 1:89–cv–1042–HTW (N.D.Ga. November 19, 1990). The

---

7. Renault dealerships existed in 49 out of 50 states. Everett Depo., Ex. 1.

8. It is unclear whether AMSC, RNUR, or any other entity was responsible for the creation of this pamphlet and its placement in the glove compartment of Vermeulen's LeCar.

9. Renault U.S.A. was subsequently dismissed as a defendant pursuant to a stipulation between the parties. R3–45.

court held that the exercise of jurisdiction over RNUR by a federal court situated in the State of Georgia would violate both the Georgia long-arm statute, O.C.G.A. § 9–10–91, and the Due Process Clause of the Fourteenth Amendment. Vermeulen appealed from the district court's order of dismissal.

### III.

### A.

■ Longstanding principles of federal law oblige us to inquire *sua sponte* whenever a doubt arises as to the existence of federal jurisdiction. *E.g.*, *Metropolitan Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, — U.S. ——, —— n. 13, 111 S.Ct. 2298, 2306 n. 13, 115 L.Ed.2d 236 (1991); *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 278, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977); *Liberty Mutual Insurance Co. v. Wetzel*, 424 U.S. 737, 740, 96 S.Ct. 1202, 1204, 47 L.Ed.2d 435 (1976); *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908), *overruled on other grounds*, 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921); *Mansfield, Coldwater & Lake Michigan R. Co. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884). Such a doubt exists in this case. Thus, before we may consider the merits of Vermeulen's appeal, we must confirm whether Vermeulen's action is even properly before the federal courts.

When the defendants removed this case to federal court, they asserted federal jurisdiction based on diversity of citizenship. Diversity of citizenship exists between

(1) citizens of different States;

(2) citizens of a State and citizens or subjects of a foreign state;

(3) citizens of different States [when] citizens or subjects of a foreign state are additional parties; and

(4) a foreign state, defined in section 1603(a) of this title, *as plaintiff* and citizens of a State or of different States.

28 U.S.C. § 1332(a) (emphasis added). For diversity jurisdiction under 28 U.S.C. § 1332, all defendants must be diverse from all plaintiffs. *See, e.g., Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267, 2 L.Ed. 435 (1806), *overruled on other grounds*, 43 U.S. (2 How.) 497, 11 L.Ed. 353 (1844); *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1557 (11th Cir.1989).

■ RNUR is a corporation wholly owned by the Government of France. Under 28 U.S.C. § 1603, an entity "a majority of whose shares or other ownership interest is owned by a foreign state" is itself deemed a "foreign state" for purposes of federal jurisdiction. *Arango v. Guzman Travel Advisors*, 761 F.2d 1527, 1533 (11th Cir.), *cert. denied*, 474 U.S. 995, 106 S.Ct. 408, 88 L.Ed.2d 359 (1985).[10] As such, it is not considered a "citizen" or "subject" of a foreign state for purposes of section 1332(a). *Goar v. Compania Peruana de Vapores*, 688 F.2d 417, 421 (5th Cir.1982); *Ruggiero v. Compania Peruana de Vapores*, 639 F.2d 872, 875–76 (2d Cir.1981); *see Arango*, 761 F.2d at 1532–33. Consequently, RNUR does not fit into any of the categories of parties which trigger diversity jurisdiction.[11] Although Vermeulen and

---

**10.** Section 1603 provides in relevant part:

(a) A "foreign state," except as used in section 1608 of this title, includes ... an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) ... a majority of whose shares or other ownership interest is owned by a foreign state ... and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603.

**11.** Prior to 1976, section 1332(a)(2) expressly provided for diversity suits against foreign states. 28 U.S.C. § 1332(a) (1970). The 1976 amendments to this section removed that provision, making it clear that foreign states, as defined in 28 U.S.C. § 1603, are not subject to jurisdiction on a diversity of citizenship theory. *See, e.g., Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 437 n. 5, 109 S.Ct. 683, 689 n. 5, 102 L.Ed.2d 818 (1989); H.R.Rep. No. 1487 at 14, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6613 ("Since jurisdiction in actions against foreign states is comprehensively treated by the new section 1330, [*see* Part IV.B. of this opinion

defendant Jeep Eagle are diverse parties under section 1332(a)(1),[12] absent diversity between Vermeulen and RNUR the requirement of complete diversity among the parties is not met. Thus, federal jurisdiction does not exist in this case on the basis of diversity of citizenship. Before we can proceed to the merits of Vermeulen's appeal, we must determine whether a separate basis of federal subject matter jurisdiction exists.

### B.

The only possible source of federal jurisdiction in suits against corporations owned by foreign states is 28 U.S.C. § 1330(a), the subject matter jurisdiction provision relating to the Foreign Sovereign Immunities Act of 1976 (FSIA), Pub.L. 94–583, 90 Stat. 2892 (currently codified at 28 U.S.C. §§ 1602–11 (1988 & Supp. II 1990)). *Goar,* 688 F.2d at 421; *Rex v. Cia. Pervana de Vapores, S.A.,* 660 F.2d 61, 64 (3d Cir. 1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 441 (1982); *Williams v. Shipping Corp. of India,* 653 F.2d 875, 881 (4th Cir.1981), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982); *see Arango,* 761 F.2d at 1532–33; *see also Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989) (holding that Foreign Sovereign Immunities Act is sole basis for obtaining jurisdiction over a foreign state as defined in 28 U.S.C. § 1603). Section 1330(a) provides for federal jurisdiction in all cases

> against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

28 U.S.C. § 1330(a). Hence, jurisdiction over a foreign state turns on the existence of a statutory or treaty-based exception to foreign sovereign immunity. This is only

*infra,*] a similar jurisdictional basis under section 1332 becomes superfluous.").

**12.** Vermeulen is a citizen of Georgia. Jeep Eagle, which is incorporated in Delaware and has

logical. If a foreign state is immune from suit in the United States, federal jurisdiction does not lie.

Several exceptions to foreign state immunity are enumerated in 28 U.S.C. § 1605. Subsection (a)(2) of this statute details three exceptions for causes of action arising out of a foreign state's commercial activities. This subsection provides that a foreign state shall not be immune from suit in an American court in any action

> based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). Because Vermeulen's allegations satisfy the third clause of section 1605(a)(2), we conclude that federal jurisdiction exists in this case.

### C.

■ The acts upon which Vermeulen's claims against RNUR are based are the allegedly negligent design and manufacture of the 1982 LeCar passenger restraint system. Under the third clause of section 1605(a)(2), therefore, RNUR is not immune from suit in the United States—and thus federal jurisdiction exists—if the design and manufacture of the LeCar restraint system occurred outside the territory of the United States; was done in connection with a commercial activity outside the United States; and caused a direct effect in the United States.

RNUR concedes that it designed and manufactured Vermeulen's LeCar in France. *See, e.g.,* Brief of Appellee at 5. Thus, the only issues are whether those acts were taken in connection with a commercial activity of RNUR outside, and

its principal place of business in Michigan, is a citizen of both those states.

whether they had a direct effect inside, the United States.

### 1.

The FSIA defines "commercial activity" as

either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d). Last Term, in *Republic of Argentina v. Weltover, Inc.,* — U.S. ——, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992), the Supreme Court expounded on this rather vague definition. The Court explained that the FSIA, and particularly the commercial activity exceptions to immunity, "largely codifies the so-called 'restrictive' theory of foreign sovereign immunity." —— U.S. at ——, 112 S.Ct. at 2165 (citing *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486–89, 103 S.Ct. 1962, 1967–69, 76 L.Ed.2d 81 (1983)). This theory "would not bar a suit based upon a foreign state's participation in the marketplace in the manner of a private citizen or corporation." *Id.,* —— U.S. at ——, 112 S.Ct. at 2166 (citing *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 698–705, 96 S.Ct. 1854, 1863–66, 48 L.Ed.2d 301 (1976) (plurality opinion)). Accordingly, the Court concluded that "when

a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Id.*

Applying these principles to the instant case, RNUR's design and manufacture of the Renault LeCar unquestionably were acts connected to a commercial activity of RNUR outside the United States. RNUR designed and built LeCars in order to sell them throughout the world. The sale of merchandise is a quintessential commercial activity. In designing and manufacturing cars for sale, RNUR acted not in any governmental capacity, "but in the manner of a private player," no different from General Motors, Ford, or any other privately owned automobile manufacturer. Indeed, in its brief to this court RNUR admitted that its dealings with AMC and AMSC were "arms length, commercial relationship[s]." Brief of Appellee at 8; *see also id.* at 6 ("RNUR entered a series of commercial agreements with American Motors Corporation...."). RNUR sold the vehicles to AMC/AMSC in France for import into the United States. *See, e.g., id.* at 5–6. We conclude, therefore, that RNUR's design and manufacture of the 1982 LeCar passenger restraint system were acts performed in connection with a commercial activity of RNUR outside the United States.[13]

---

**13.** The fact that Vermeulen seeks to recover for personal injuries does not belie the commercial nature of RNUR's activity and thus does not require us to analyze this case under the "noncommercial torts" exception to foreign sovereign immunity, 28 U.S.C. § 1605(a)(5). Section 1605(a)(5) provides for jurisdiction in American courts in any case

not otherwise encompassed in [the paragraph on commercial activities] in which money damages are sought against a foreign state for personal injury or death,

subject to certain enumerated exceptions. *Id.* (emphasis added). The legislative history of the third commercial activity exception in section 1605(a)(2) states that Congress intended to subject foreign commercial conduct to jurisdiction "consistent with principles set forth in section 18, Restatement of the Law, Second, Foreign Relations Law of the United States (1965)." H.R.Rep. No. 94–1487 at 19, 1976 U.S.C.C.A.N. at 6618. The *Restatement* provides for jurisdic

tion when "the conduct and its effect are generally recognized as constituent elements of a ... tort under the law of states that have reasonably developed legal systems." Restatement (Second) of the Foreign Relations Law of the United States § 18, at 47 (1965). Negligent design and manufacture of an automobile resulting in personal injury unquestionably is a tort generally recognized in American law. Thus, Vermeulen's claims are properly within the third commercial activity exception to foreign sovereign immunity contained in 28 U.S.C. § 1605(a)(2). *See Ohntrup v. Firearms Center, Inc.,* 516 F.Supp. 1281, 1285 (E.D.Pa.1981) ("Personal injury suits are within the scope of this exception."), *aff'd,* 760 F.2d 259 (3d Cir.1985); *see also Martin v. Republic of South Africa,* 836 F.2d 91, 93 (2d Cir.1987) (applying section 1605(a)(2) in ordinary personal injury case); *Zernicek v. Brown & Root, Inc.,* 826 F.2d 415, 418 (5th Cir.1987) (same), *cert. denied,* 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 862 (1988); *Australian*

## 2.

■ The remaining question is whether the allegedly negligent design and manufacture of the LeCar passenger restraint system had a "direct effect" in the United States. In *Republic of Argentina*, the Supreme Court rejected the suggestion that "direct effect" means a substantial or foreseeable effect. —— U.S. at ——, 112 S.Ct. at 2168. Rather the Court held that "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's ... activity.'" *Id.* (quoting *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 152 (2d Cir.1991)).

The complaint in this case alleges that the injuries Vermeulen suffered in an automobile accident on the roads of Georgia were the result of RNUR's negligent design and manufacture of the LeCar passenger restraint system. We can hardly imagine a more immediate consequence of the defendant's activity. Thus, under the definition articulated in *Republic of Argentina*, the act upon which Vermeulen's claim is based had a direct effect in the United States.

■ The *Republic of Argentina* Court acknowledged that the "direct effect" element of section 1605(a)(2) might be construed as embodying the "minimum contacts" test of *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). —— U.S. at ——, 112 S.Ct. at 2169; *see also Waukesha Engine Div., Dresser Americas, Inc. v. Banco Nacional de Fomento Cooperativo*, 485 F.Supp. 490, 492 (E.D.Wis.1980) (holding that legislative history shows that minimum contacts test is incorporated in jurisdictional provisions of FSIA). Arguably, if the direct effect requirement were not so interpreted, the exercise of federal subject matter jurisdiction pursuant to the FSIA could, in a given case, violate the Due Process Clause of the Fifth Amendment. *Republic of Argentina*, —— U.S. at ——, 112 S.Ct. at 2169. Nevertheless, the Court did not resolve whether section 1605(a)(2)

incorporates the minimum contacts test. Instead it assumed that the Due Process Clause confines the exercise of jurisdiction against foreign states and found that Argentina possessed minimum contacts that would satisfy the constitutional test. *Id.* Because we similarly conclude that RNUR possessed minimum contacts to satisfy the Due Process Clause, we likewise hold that the exercise of federal jurisdiction in this case would not violate RNUR's constitutional rights.

## 3.

### a.

■ A defendant is constitutionally amenable to a forum's specific jurisdiction if it possesses sufficient minimum contacts with the forum to satisfy due process requirements, and if the forum's exercise of jurisdiction comports with "'traditional notions of fair play and substantial justice.'" *International Shoe Co.*, 326 U.S. at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)); *Morris*, 843 F.2d at 492. This two-part test embodies the controlling due process principle that a defendant must have "fair warning" that a particular activity may subject it to the jurisdiction of a foreign sovereign. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 2181, 85 L.Ed.2d 528 (1985); *Madara v. Hall*, 916 F.2d 1510, 1516 (11th Cir.1990). The relevant forum when a case is brought under the FSIA is the United States. *See, e.g., Republic of Argentina*, —— U.S. at ——, 112 S.Ct. at 2169 (holding that "Argentina '"purposefully avail[ed] itself of the privilege of conducting activities within the [United States]"'") (quoting *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2183 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958))) (brackets in *Republic of Argentina*); *Alberti v. Empresa Nicaraguense de la Carne*, 705 F.2d 250, 252 (7th Cir.1983); *Texas Trading & Milling Corp. v. Federal*

*Gov't Aircraft Factories v. Lynne*, 743 F.2d 672, 674 (9th Cir.1984) (same), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1189, 84 L.Ed.2d 335 (1985); *Sugarman v. Aeromexico, Inc.*, 626 F.2d 270, 272

(3d Cir.1980) (same); *Four Corners Helicopters, Inc. v. Turbomeca S.A.*, 677 F.Supp. 1096, 1099 (D.Colo.1988) (same).

*Republic of Nigeria,* 647 F.2d 300, 314 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982); *Ruiz v. Transportes Aereos Militares Ecuadorianos,* 103 F.R.D. 458, 459 (D.D.C.1984).

■ To constitute constitutionally minimum contacts, the defendant's contacts with the applicable forum must satisfy three criteria. First, the contacts must be related to the plaintiff's cause of action or have given rise to it. *Burger King,* 471 U.S. at 472, 105 S.Ct. at 2181; *Madara,* 916 F.2d at 1516. Second, the contacts must involve "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum ...," thus invoking the benefits and protections of its laws." *Hanson,* 357 U.S. at 253, 78 S.Ct. at 1240; *see also Burger King,* 471 U.S. at 474–75, 105 S.Ct. at 2183–84. Third, the defendant's contacts with the forum must be "such that [the defendant] should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

b.

In recent years, the Supreme Court has grappled with the "purposeful availment" and "reasonable anticipation" elements of this test through its consideration of the so-called "stream of commerce" theory of personal jurisdiction. In *World–Wide Volkswagen,* the Court considered the claim of two injured motorists that Oklahoma courts had jurisdiction over a New York-based wholesale distributor and its New York automobile retailer, which, plaintiffs contended, had sold them a defective automobile. Plaintiffs had purchased the car in New York and were injured in Oklahoma en route to Arizona. Neither defendant conducted any business in Oklahoma, shipped or sold any products to or in the state, or sought in any way to take advantage of the Oklahoma market.[14] Nevertheless, plaintiffs contended that the defen-

dants could have foreseen that the plaintiffs would drive their vehicle to Oklahoma and suffer injury there, and that such foreseeability provided sufficient basis for Oklahoma's exercise of jurisdiction over the defendants.

The Court rejected this argument, emphasizing that " 'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *Id.* at 295, 100 S.Ct. at 566. The Court, however, also rejected the notion that foreseeability is irrelevant to the jurisdictional inquiry, noting that "the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 297, 100 S.Ct. at 567. The Court continued:

[I]f the sale of a product or manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.

*Id.* at 297–98, 100 S.Ct. at 567.

The Court concluded that the defendants in *World–Wide Volkswagen,* New York corporations without any association with the Oklahoma market, had not delivered their products into the stream of commerce with the expectation that they would be purchased in Oklahoma. Thus, the Court held that the "stream of commerce" analy-

---

**14.** Indeed, the Court noted that "there was no showing that any automobile sold by [the distributor or the retailer] has ever entered Okla-

homa with the single exception of the vehicle involved in the present case." *World–Wide Volkswagen,* 444 U.S. at 289, 100 S.Ct. at 563.

sis did not furnish a basis for Oklahoma's exercise of jurisdiction over the defendants.

In *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), the Court reassessed its "stream of commerce" analysis in the context of an indemnification action brought in California by Cheng Shin, a Taiwanese tire manufacturer, against Asahi, the Japanese tire valve manufacturer that had sold an allegedly defective component part to Cheng Shin. The record in that case revealed that Asahi was aware that its tire valves were incorporated into tires that were sold in California.

In a plurality opinion authored by Justice O'Connor, four Justices concluded that Asahi did not possess sufficient minimum contacts with California to permit California's exercise of jurisdiction under the Due Process Clause. The plurality determined that minimum contacts did not exist when "the defendant acted by placing a product in the stream of commerce, and the stream eventually swept defendant's product into the forum State, but the defendant did nothing else to purposefully avail itself of the market in the forum State." *Id.* at 110, 107 S.Ct. at 1031 (plurality opinion).

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.

*Id.* at 112, 107 S.Ct. at 1032 (plurality opinion). The plurality concluded that because Asahi did not do business in California; had no office, agents, employees, or property in California; did not advertise or otherwise solicit business in California; and did not create, control, or employ the distribution system that brought its valves to Cali-

fornia, it did not possess minimum contacts with California. *Id.*

The plurality also concluded that California's exercise of jurisdiction over Asahi in this case did not comport with "traditional notions of fair play and substantial justice," and that therefore, regardless of whether Asahi possessed minimum contacts with California, the State's exercise of jurisdiction over Asahi violated due process. *Id.* at 113–116, 107 S.Ct. at 1033–34.

Justice Brennan, although concurring in the plurality's holding that California's exercise of jurisdiction did not comport with "traditional notions of fair play and substantial justice" and therefore violated due process, did not join the plurality's holding that Asahi did not possess minimum contacts with California.[15] Quoting liberally from *World–Wide Volkswagen,* Justice Brennan emphasized that the "additional conduct" showing required by the plurality was unnecessary, insofar as "[t]he stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale." *Id.* at 117, 107 S.Ct. at 1034 (Brennan, J., concurring in part and concurring in the judgment). Justice Brennan maintained that:

> [A]s long as a participant in [this flow of products] is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State and indirectly benefits from the State's laws that regulate and facilitate commercial activity.

*Id.* at 117, 107 S.Ct. at 1034–35 (Brennan, J., concurring in part and concurring in the judgment).

Finally, Justice Stevens, although concurring in the judgment, also declined to join the plurality's holding regarding minimum contacts on the grounds that that

---

15.  Justice Brennan was joined by Justices Marshall, Blackmun and White.

discussion was unnecessary given the plurality's decision regarding the "fair play and substantial justice" prong of the due process analysis.[16] Justice Stevens noted, however, that an analysis of purposeful availment and minimum contacts should take into account "the volume, the value, and the hazardous character of the components," *id.* at 122, 107 S.Ct. at 1037 (Stevens, J., concurring in part and concurring in the judgment), suggesting that "a regular course of dealing that results in deliveries of over 100,000 units annually over a period of several years would constitute 'purposeful availment' even though the item delivered to the forum State was a standard product marketed throughout the world." *Id.* (Stevens, J., concurring in part and concurring in the judgment).

As is evident from the foregoing discussion, the current state of the law regarding personal jurisdiction is unsettled. Because jurisdiction in the United States over RNUR in this case, however, is consistent with due process under the more stringent "stream of commerce plus" analysis adopted by the *Asahi* plurality, we need not determine which standard actually controls this case.[17]

■ Preliminarily, we note that the fact that title to the Renault vehicles passed to AMSC in France rather than in the United States in no way determines the degree of contacts between the United States and RNUR. " 'If *International Shoe* stands for anything ..., it is that a truly interstate [or international] business may not shield itself from suit by a careful but formalistic structuring of its business dealings.' " *Benitez–Allende v. Alcan Aluminio Do Brasil, S.A.,* 857 F.2d 26, 30 (1st Cir.1988), *cert. denied,* 489 U.S. 1018, 109 S.Ct. 1135, 103 L.Ed.2d 196 (1989) (quoting

*Vencedor Manufacturing Co. v. Gougler Industries,* 557 F.2d 886, 891 (1st Cir. 1977)); *see also Meyers v. ASICS Corp.,* 711 F.Supp. 1001, 1005 n. 3 (C.D.Cal.1989) (citing *Taubler v. Giraud,* 655 F.2d 991, 995 (9th Cir.1981)); *Sound Move Autoplaza, Inc. v. Nissan Motor Co.,* 1989 WL 50797 at 8, 1989 U.S.Dist. Lexis 5077 at 6 (S.D.N.Y.1989). Likewise, the fact that RNUR did not maintain a direct physical presence in the United States does not necessarily mean that no minimum contacts exist between the defendant and this country. *Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184; *Cable/Home Communication Corp. v. Network Productions,* 902 F.2d 829, 858 (11th Cir.1990). Finally, we recognize that no "alter ego" relationship existed between RNUR and AMSC. Thus, AMSC's obvious contacts with the United States are not imputed to RNUR. This is not to say, however, that RNUR does not possess minimum contacts with the United States as a result of its own *independent* role in the process that brought the appellant's 1982 Renault LeCar to the United States. *See Warren v. Honda Motor Co.,* 669 F.Supp. 365, 369–70 (D.Utah 1987); *ASICS Corp.,* 711 F.Supp. at 1005 n. 4. We now proceed to an examination of RNUR's contacts with the United States under Justice O'Connor's "stream of commerce plus" analysis in *Asahi.*

As noted above, Justice O'Connor stated in *Asahi* that "the placement of a product into the stream of commerce, *without more,* is not an act of the defendant purposefully directed toward the forum State." *Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032 (emphasis added). It is indisputable that RNUR delivered its vehicles into the "stream of commerce" with the expectation that they would be purchased by consum-

---

**16.** Justices White and Blackmun also joined Justice Stevens.

**17.** We note, however, that in the absence of further guidance from the Supreme Court, several courts have declined to follow the *Asahi* plurality's analysis, and have instead continued to apply the "stream of commerce" approach adopted in *World–Wide Volkswagen. See, e.g., Irving v. Owens–Corning Fiberglass Corp.,* 864

F.2d 383, 386 (5th Cir.), *cert. denied,* 493 U.S. 823, 110 S.Ct. 83, 107 L.Ed.2d 49 (1989); *DeMoss v. City Market, Inc.,* 762 F.Supp. 913, 918 (D.Utah 1991); *Abuan v. General Electric Co.,* 735 F.Supp. 1479, 1483 (D.Guam 1990); *Curtis Management Group v. Academy of Motion Pictures Arts and Sciences,* 717 F.Supp. 1362, 1369 (S.D.Ind.1989); *Wessinger v. Vetter Corp.,* 685 F.Supp. 769, 776–77 (D.Kan.1987); *Hall v. Zambelli,* 669 F.Supp. 753, 756 (S.D.W.Va.1987).

ers in the United States. The distribution system created by the alliance between Renault and AMC/AMSC contemplated a nationwide network of Renault dealerships. Everett Depo. at 35; R–34–Ex.A, at 28–29.

The remaining question under the *Asahi* plurality's analysis is whether RNUR engaged in any additional conduct such that it could be said to have "purposefully availed" itself of the privilege of conducting business in the United States. We hold that RNUR did engage in such activity under the standards announced by the *Asahi* plurality.

First, RNUR designed the Renault LeCar for the American market. *Asahi*, 480 U.S. at 112, 107 S.Ct. at 1032. The record reflects that meetings took place between RNUR and AMC/AMSC officials which resulted in RNUR's modification of its vehicles specifically to accommodate the American market. Everett Depo. at 21, 45–47. RNUR did this to "promote the widest distribution of Renault products." R3–34–Ex.A, at 1. *Compare In re Perrier Bottled Water Litigation*, 754 F.Supp. 264, 268 (D.Conn.1990) (holding that Perrier designed its product for the United States market because Perrier's liquid containers bore liquid ounce markings rather than metric measure); *Hawes v. Honda Motor Co.*, 738 F.Supp. 1247, 1251 (E.D.Ark.1990); *In re All Terrain Vehicles Litigation*, 1989 WL 30948, at 4, 1989 U.S.Dist. Lexis 1843, at 10 (E.D.Pa.1989); *Warren*, 669 F.Supp. at 370.

Second, RNUR advertised its product in the United States. *Asahi*, 480 U.S. at 112, 107 S.Ct. at 1032. It is undisputed that Renault vehicles, including the LeCar, were the subject of a nationwide advertising campaign. *See Morris*, 843 F.2d at 494 (holding defendant's advertising in national trade magazines sufficient to establish that defendant advertised in forum state); *see also Sinatra v. National Enquirer, Inc.*, 854 F.2d 1191, 1196 (9th Cir.1988) (nonresident defendant's advertising in, among other publications, *Town & Country* and the *Wall Street Journal* constituted advertis-

ing in California); *Fogle v. Ramsey Winch Co.*, 774 F.Supp. 19, 22 (D.D.C.1991); *Cartwright v. Fokker Aircraft*, 713 F.Supp. 389, 394 (N.D.Ga.1988). RNUR had a large hand in directing that campaign. Article XI of the Distributor's Agreement does state that AMSC would have full and exclusive responsibility for advertising Renault products; AMSC, however, covenanted to "work closely with Renault in the planning and developing of themes and strategy and the related budget." R3–34–Ex.A, at 12. The record reflects that such coordination did in fact occur. Everett Depo. at 16, 20, 21, 24. Furthermore, Renault reserved the right to veto any advertising that it deemed "injurious to Renault's business, ... likely to mislead or deceive the public, ... at variance with the business, advertising or public relations policies of Renault, or ... likely to impair the image or goodwill of Renault." R3–34–Ex.A, at 13; *see id.* at 29; R3–34–Ex.E, at 15. This reservation indicates that Renault reviewed all advertising before AMSC used it. RNUR placed great emphasis on the nature and quality of the marketing strategies used to market its products, and retained for itself a great deal of ultimate, if not daily, control over such marketing. Under these circumstances, RNUR, as well as AMSC, was responsible for the marketing and advertising of the LeCar in the United States. *See Sinatra*, 854 F.2d at 1197 (nonresident defendant's instructions to American representative to advertise, and defendant's approval of such advertising, established "advertising" contact under *Asahi*).

Third, RNUR, in conjunction with AMSC, established channels for providing regular advice to customers in the United States. *Asahi*, 480 U.S. at 112, 107 S.Ct. at 1032. Numerous Renault dealerships existed throughout the United States. These franchises were established pursuant to the Market Representation Plan, R3–34–Ex.A, at 4, which incorporated Renault's strategies and vision regarding the distribution of its products.

Although AMSC exercised day-to-day control over the establishment and termination of Renault dealerships in the United

States, Renault itself set the terms according to which all these dealerships conducted business: AMSC covenanted to "use its best efforts to assure that Dealers will comply with all sales and service manuals that Renault may from time to time issue relating to the sale and servicing of Renault products and other matters covered by [the Distributor's Agreement] or the Dealer franchises." *Id.* at 14. The Distributor's Agreement also stated that "[A]ny dealership or dealerships operated by [AMSC] for the sale of Renault Products at retail shall at all times satisfy the standards for Renault dealerships prescribed by this Agreement, the Dealer Franchises and the sales and service manuals that Renault may issue from time to time relating to Dealers." *Id.*

Further, RNUR took an active role in training AMSC personnel in the repair, servicing, and preparation of Renault products. R3–34–Ex.A, at 7–8. Finally, the record reflects that RNUR and AMSC jointly engaged in the financing of retail dealerships throughout the United States. R3–34–Ex.C, at 2–3; –Ex.D, at 6–7. Under these circumstances, there is no question but that Renault, as well as AMSC, established channels for providing regular advice to customers in the United States.

Fourth, RNUR created and controlled the distribution network that brought its products into the United States. *Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032. As discussed in detail in Part I.A. of this opinion, the Distributor's Agreement between RNUR and AMSC created a nationwide network for Renault products, over which Renault retained *ultimate* control through various provisions in the Agreements executed by RNUR and AMC/AMSC, and pursuant to which AMSC's decisions were subject to the review or acquiescence of RNUR. *See generally* R3–34–Ex.A. *See also* R3–34–Ex.B; R3–34–Ex.E. Further, RNUR was fully involved in the implementation of the Agreements between itself

and AMSC/AMC, even though AMSC retained day-to-day control over the nationwide Renault distribution network. Finally, RNUR's involvement in the Renault distribution network is evidenced by the extensive financial support rendered AMC by RNUR. Such support, described in detail in part I.B. above, manifested itself in capital investments, reimbursements for marketing and launch costs, and infusions of Renault personnel and resources into AMC/AMSC. RNUR not only enabled AMSC to fulfill its role as Renault's exclusive American distributor and to operate to RNUR's major financial benefit the very network that RNUR disclaims as the sole responsibility of AMSC; RNUR's support also made AMC/AMSC dependent on RNUR so as to allow the latter significant control over the operations of the former. *See supra* part I.C.[18]

█ In sum, RNUR designed the Renault LeCar for the American market, advertised the LeCar in the United States, established channels for customers in the United States to seek advice about the LeCar, and maintained a distribution network by which LeCars were imported into the United States. These contacts are sufficiently related to appellant's cause of action to confer specific jurisdiction upon the United States. RNUR's activities were inextricable links in the advertising and distribution network by which the appellant obtained her vehicle, the subject of this product liability suit. More important, RNUR directly targeted its LeCars toward the United States and thus fairly could expect to defend in this country the very type of action this case presents: a personal injury action challenging the car's design and safety. RNUR *intended* its LeCars to be brought to the United States and took numerous *affirmative* steps to bring that result about, and jurisdiction in this country would not violate RNUR's due process rights. Because RNUR satisfied all the

---

18. We also note that the additional circumstances suggested by Justice Stevens to establish minimum contacts are present in this case. *Asahi,* 480 U.S. at 122, 107 S.Ct. at 1037 (Stevens, J., concurring in part and concurring in the judgment) (analysis of purposeful availment and minimum contacts should take into account "the volume, the value, and the hazardous character of the components").

criteria identified by the *Asahi* plurality as indicative of purposeful availment, we hold that RNUR possessed minimum contacts with the United States sufficient to satisfy the first prong of the due process inquiry.

c.

■ Even if a nonresident defendant possesses minimum contacts with the forum, the exercise of jurisdiction nevertheless violates due process unless it comports with traditional notions of fair play and substantial justice. *International Shoe Co.*, 326 U.S. at 316, 66 S.Ct. at 158. In determining the fairness and reasonableness of a forum's exercise of jurisdiction, a court must consider, among other things, "the burden on the defendant, the interests of the forum ..., and the plaintiff's interest in obtaining relief." *Asahi*, 480 U.S. at 113, 107 S.Ct. at 1033 (quoting *World-Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. at 564 (citations omitted)). The *Asahi* Court cautioned that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." 480 U.S. at 114, 107 S.Ct. at 1033. The Court also noted, however, that "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum will justify even the serious burdens placed on the alien defendant." *Id.* Such is the case here.

As reported above, *Asahi* was an indemnification action brought by Cheng Shin, the Taiwanese manufacturer of an allegedly defective tire, against Asahi, the Japanese manufacturer of the component tire valve that Cheng Shin integrated into its final product. The individual injured as a result of the alleged defect in the tire had already obtained relief in the California courts from Cheng Shin, which sought indemnification by Asahi.

The *Asahi* Court, upon consideration of the factors outlined above, determined that California's exercise of jurisdiction over Asahi did not comport with traditional notions of fair play and substantial justice. The Court noted that the burden on Asahi was severe, in that it had to "traverse the distance between [its] headquarters in Japan and the Superior Court of California," and "submit its dispute with Cheng Shin to a foreign nation's judicial system." *Id.* at 114, 107 S.Ct. at 1033. The Court also noted that because the plaintiff, Cheng Shin, was not a California resident, and because the action was "primarily about indemnification rather than safety standards," the interest of the forum State in having the dispute adjudicated there was diminished considerably. *Id.* Similarly, the defendant's lack of contacts with California lessened the plaintiff's interest in having the dispute adjudicated in California. *Id.* Finally, the Court noted that in an international context, the interests of foreign nations in a State's assertion of jurisdiction over their citizens, as well as the "[f]ederal interest in Government's foreign relations policies," counseled "an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State." *Id.* at 115, 107 S.Ct. at 1034. Thus, on the basis of these factors, the Court held that California's exercise of jurisdiction over the plaintiff did not comport with traditional notions of fair play and substantial justice.

This case is different in kind from *Asahi*. First, the plaintiff in this case is not a foreign corporation seeking indemnification from another foreign corporation, as in *Asahi*, but rather a United States citizen who seeks relief for the crippling injuries she suffered as a result of an alleged defect in her Renault LeCar. Her interest in having her case adjudicated in this country is manifest.

Second, this case, unlike *Asahi*, is not about indemnification but rather about product safety. The interest of the United States in adjudicating this dispute is also manifest, given that it has a compelling interest in protecting persons within its borders from unsafe products that find their way into the country. *Morris*, 843 F.2d at 495.

Third, RNUR's interest in having this dispute adjudicated abroad is minimal; whereas Asahi was burdened because it was forced to submit its dispute with Cheng Shin to a foreign nation's judicial system, RNUR stands ready to undertake the defense of any lawsuit against AMSC that arises from injuries alleged to have been caused by defects in Renault vehicles, having expressly reserved the right to take over the defense of any lawsuit in the United States involving allegedly defective Renault products. R3–34–Ex.A, at 17–18. Thus, subjecting RNUR to the American judicial system works no unfair surprise against it. Moreover, in light of the relative burden that would be caused Vermeulen if this case were adjudicated in France, the burdens on RNUR caused by adjudication in this country are by no means unfair. *See Delong Equipment Co.*, 840 F.2d at 850, 854 ("[A]ny inconvenience caused to [defendants] by subjecting them to the jurisdiction of the Northern District of Georgia is overridden by the greater inconvenience of requiring a Georgia plaintiff, injured in Georgia by the defendants' purposeful activity in and directed at Georgia, to pursue its cause of action in a foreign forum.").

Fourth, although witnesses and evidence concerning the LeCar's manufacture and design are located in France, evidence and witnesses concerning the accident itself are located primarily in Georgia. Furthermore, dismissal of RNUR from Vermeulen's suit would not end the litigation, but would merely splinter it, leaving Vermeulen and the other defendants in Georgia, while forcing Vermeulen to proceed against RNUR, if at all, in France. Thus, efficient resolution of this case suggests that jurisdiction be asserted over RNUR in the United States. *Morris*, 843 F.2d at 495.

In short, this is not "one of those rare cases in which 'minimum requirements inherent in the concept of "fair play and substantial justice" ... defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities.'" *Asahi*, 480 U.S. at 116, 107 S.Ct. at 1034 (Brennan, J., concurring

in part and concurring in the judgment) (quoting *Burger King*, 471 U.S. at 477–78, 105 S.Ct. at 2184–85).

Thus, we hold that RNUR possesses sufficient contacts with the United States to satisfy due process requirements, and that jurisdiction in an American court over RNUR comports with traditional notions of fair play and substantial justice.

### D.

RNUR's design and manufacture of the 1982 Renault LeCar in France was an act which was taken in connection with a commercial activity under the FSIA and which had a direct effect in the United States. Accordingly, federal jurisdiction exists in this case.

### IV.

Having determined that federal jurisdiction lies in this case, we may consider the merits of Vermeulen's appeal. We review *de novo* the district court's dismissal for lack of *in personam* jurisdiction. *E.g.*, *Olivier v. Merritt Dredging Co.*, 954 F.2d 1553, 1555 (11th Cir.1992).

The district court held that its exercise of personal jurisdiction over RNUR would violate both the Georgia long-arm statute and the Due Process Clause of the Fourteenth Amendment, the latter because RNUR did not have constitutionally minimum contacts with the State of Georgia. In so holding, the court acted under the misapprehension that federal jurisdiction in this case was based on diversity of citizenship. This was the theory argued by the parties. In a diversity action, a federal court may assert jurisdiction over a nonresident defendant only to the extent permitted by the long-arm statute of the forum state, and only if the exercise of jurisdiction comports with the requirements of due process, namely that minimum contacts exist between the defendant and the forum state and that jurisdiction be consistent with traditional notions of fair play and substantial justice. *Morris*, 843 F.2d at 492 n. 3; *Gold Kist, Inc. v. Baskin Rob-*

*bins Ice Cream,* 623 F.2d 375, 377 (5th Cir.1980).[19]

▮▮▮▮] Subject matter jurisdiction in this case lies exclusively under the FSIA. The FSIA contains its own long-arm statute for obtaining personal jurisdiction over foreign states. Under 28 U.S.C. § 1330(b), "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject matter] jurisdiction ... where service has been made under [28 U.S.C. § 1608]." Neither compliance with the forum state's long-arm statute nor minimum contacts between the defendant and the forum state are required. *See, e.g., Republic of Argentina,* — U.S. at ——, 112 S.Ct. at 2169 (holding that "Argentina ' "purposefully avail[ed] itself of the privilege of conducting activities within the [*United States*]" ' ") quoting *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183 (quoting *Hanson,* 357 U.S. at 253, 78 S.Ct. at 1240) (brackets in *Republic of Argentina;* emphasis added); *Alberti,* 705 F.2d at 252; *Texas Trading,* 647 F.2d at 314 (holding that relevant forum for due process analysis in claims brought under FSIA is United States, not particular forum state); *Ruiz,* 103 F.R.D. at 459 (same). Hence, the district court erred in dismissing Vermeulen's claims against RNUR for lack of personal jurisdiction on the ground that such jurisdiction was improper under both the Georgia long-arm statute and *International Shoe Co. v. Washington.*

The judgment of the district court is REVERSED. The case is REMANDED to the district court for further proceedings consistent with this opinion.

RONEY, Senior Circuit Judge, concurring:

I concur in the decision of the court, but would cast it in somewhat different terms. This panel previously rendered an opinion on July 9, 1992 reversing the district court, *Vermeulen v. Renault U.S.A., Inc.,* 965 F.2d 1014, *amended by,* 975 F.2d 746 (11th Cir.1992). On December 28, 1992, more than six months thereafter, appellee, Regie

Nationale Des Usines Renault U.S.A., Inc. ("RNUR"), having apparently employed another firm of attorneys, has filed a "Motion to Vacate Order," asserting for the first time that, as a French government-owned corporation, it is a "foreign state" for purposes of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1604–08, and is not a "citizen" or "subject" of a foreign state for purposes of 28 U.S.C. § 1332 governing diversity of citizenship. RNUR had asserted in the district court and in this court only that the federal court lacked jurisdiction based upon § 1332 and the Georgia long-arm statute. It did not assert any lack of jurisdiction based upon immunity.

In denying the motion to vacate our order reversing the district court's decision based on the minimum contacts required for diversity jurisdiction, I would hold four things: *First,* I would hold that RNUR has waived any ground of jurisdiction not initially asserted in the district court. Although sovereign immunity goes to subject matter jurisdiction, which normally cannot be waived and is noticeable by a court at any stage of the litigation, the unique jurisdictional grant provided for in the FSIA allows a foreign state, by waiving its immunity, to waive what would otherwise be a defect in subject matter jurisdiction of the federal court. *Canadian Overseas Ores Ltd. v. Compania de Acero Del Pacifico S.A.,* 528 F.Supp. 1337 (D.C.N.Y.1982), *affirmed on other grounds,* 727 F.2d 274 (2d Cir.1984). Personal jurisdiction can, of course, always be waived and I would hold RNUR has waived any ground of personal jurisdiction not submitted to the district court or argued on appeal. *Insurance Corp. v. Compagnie des Bauxites,* 456 U.S. 694, 703–05, 102 S.Ct. 2099, 2104–05, 72 L.Ed.2d 492 (1982).

*Second,* I concur in the court's opinion that, although federal subject matter jurisdiction does not exist on the basis of diversity of citizenship, federal jurisdiction does exist in this case under 28 U.S.C. §§ 1330(a) and 1605(a)(2).

**19.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as circuit precedent all decisions of the former Fifth Circuit rendered before October 1, 1981.

*Third,* I would hold, as the court does, that the minimum contacts test under the due process clause of the Constitution and the Georgia long-arm statute, although that statute is not applicable in this case, is essentially the same test that a court should apply under the long-arm statute in the Foreign Sovereign Immunities Act. Thus the decision of the district court and the prior decision of this court which reversed, applied the correct test. Therefore, all that the district court said and all that we said regarding the contacts of RNUR with the forum state would be equally applicable under the FSIA long-arm statute. Thus there is no need to remand this case to the district court for its consideration under the proper statute, as requested by RNUR. We need not decide the wider issue as to whether contacts elsewhere in the United States would be sufficient in this case, since the issue as presented to the district court and this court was based on contacts with Georgia, the forum state.

*Fourth,* I fully concur in the court's opinion that RNUR had sufficient contacts with the United States and Georgia to satisfy the requirements of the FSIA long-arm statute and the due process requirements of the Constitution.