# Third District Court of Appeal

## State of Florida

Opinion filed March 15, 2023.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D21-803
Lower Tribunal No. 17-15147
_____

**Mazda Motor Corporation, etc.,**
Appellant,

vs.

**Lourdes Triche, as the Personal Representative of the Estate of Alexandre Arrata Acevedo, et al.,**
Appellees.

An Appeal from a non-final order from the Circuit Court for Miami-Dade County, Beatrice Butchko, Judge.

Bowman and Brooke, LLP, and Stephanie M. Simm, John C. Seipp, Jr., and Daniel A. Rock, for appellant.

Clark, Fountain, La Vista, Prather, & Littky-Rubin, LLP, and Julie H. Littky-Rubin (West Palm Beach); Halpern Santos & Pinkert, P.A., and Ian D. Pinkert, Jay Halpern, and Jacqueline Halpern, for appellees.

Before LOGUE, LINDSEY, and LOBREE, JJ.

LOGUE, J.

Mazda Motor Corporation ("Mazda Japan"), a company incorporated and headquartered in Japan, is a defendant in a products liability case over the design of a Mazda vehicle. The vehicle was sold in Florida to a Florida resident and, when rear-ended, burst into flames on the streets of Florida killing its owner. Mazda Japan appeals from a non-final order denying its motion to dismiss for lack of personal jurisdiction. It challenges only whether Mazda Japan has sufficient minimum contacts with Florida for the State of Florida to assert personal jurisdiction consistent with federal due process.

Although Mazda Japan contends that the targeting of Mazda products to Florida was done solely by an American corporate subsidiary, the record before us shows Mazda Japan itself did more than simply place its vehicles in the global stream of commerce heedless of the American and Florida markets. Instead, it engaged in the sort of "additional conduct" "indicat[ing] an intent or purpose to serve the market in the forum State" that the U.S. Supreme Court has held warrants specific jurisdiction. Among other actions detailed below, Mazda Japan admitted that its vehicles are "intended for the United States market, including Florida" (emphasis added), that it designed the vehicles for that market, registered trademarks to advertise the vehicles in that market, and, from Japan, ordered recalls expressly naming Florida.

2

The U.S. Supreme Court recently identified "this exact fact pattern (a resident-plaintiff sues a global car company, extensively serving the state market in a vehicle, for an in-state accident) as an illustration—even a paradigm example—of how specific jurisdiction works." Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1028 (2021) (emphasis added). Following this precedent, we affirm.

## BACKGROUND

The plaintiff, Lourdes Triche, as personal representative of the estate of Alexandre Arrata Acevedo, filed a products liability action in the Miami-Dade County Circuit Court on behalf of her son who died when his 2016 Mazda3 Sport caught fire after a rear-end collision in Florida.

The subject vehicle was designed and developed by Mazda Japan in its company headquarters in Japan. The vehicle was manufactured and assembled in Mexico by Mazda Motor Manufacturing de Mexico, S.A. de C.V., ("Mazda Mexico"), a subsidiary of Mazda Japan. Mazda Japan purchased the vehicle from Mazda Mexico and then re-sold it to Mazda Motor of America, Inc., ("Mazda North America") a subsidiary of Mazda Japan. After taking title, Mazda Japan shipped the vehicle from Mexico to the United States f/o/b Mexico with Mazda North America as the buyer.

3

Thereafter, Mazda North America sold the vehicle to South M.M., LLC d/b/a South Motors Mazda ("Mazda South Florida"). The decedent purchased the vehicle from Mazda South Florida.

In March 2019, the Plaintiff sued multiple Mazda entities, including Mazda Japan, Mazda North America, and Mazda South Florida, alleging claims for strict liability and negligence pertaining to a design or manufacturing defect of the subject vehicle. Mazda North America has submitted itself to the jurisdiction of the court and remains a defendant below. In the course of the litigation, however, Mazda North America insists it can provide no discovery regarding the design of the vehicle because all such information is possessed only by Mazda Japan, which refuses to provide American-style discovery concerning the design.

Mazda Japan moved to dismiss for lack of personal jurisdiction asserting that it was not subject to general or specific jurisdiction because it lacked sufficient minimum contacts with Florida such that the State of Florida's assertion of personal jurisdiction violated the due process clause of the Fourteenth Amendment to the U.S. Constitution.

In support of dismissal, Mazda Japan submitted two declarations from Osamu Yamashina, an official of Mazda Japan. In his declarations, Mr. Yamashina averred:

4

- Mazda Japan is incorporated and has its principal place of business in Hiroshima, Japan;

- Mazda Japan has never been incorporated in the State of Florida and its principal place of business has never been located in the State of Florida;

- Mazda Japan does not manufacture, design, or service vehicles in the State of Florida;

- Mazda Japan does not distribute at the wholesale level vehicles to or within the State of Florida;

- Mazda Japan does not sell at the retail level vehicles in the State of Florida;

- Mazda Japan does not advertise or market its products in Florida or to Florida residents;

- Such activities are conducted exclusively by independent dealers all of whom are independent corporate entities from Mazda Japan;

- Mazda Japan does not advise Mazda North America into which states vehicles purchased from Mazda Japan should be distributed;

- Mazda Japan and Mazda North America are separate legal entities whose corporate structures have been incorporated and maintained separately;

- Mazda Japan and Mazda North America engage in separate and distinct activities relative to the Mazda brand; and

- The Mazda dealer network in the United States consists of independent corporate entities and are overseen by Mazda North America.

In response to the motion, Plaintiff filed various materials obtained in discovery. These materials reflect Mazda Japan is the leader of a world-wide conglomerate of corporations that design, manufacture, and market a renowned brand of vehicles internationally. In its "Company Profile 2018, Mazda in Brief," an annual statement of the consolidated financials of over 68 Mazda corporations world-wide, Mazda Japan described its "main business" as the "manufacture and sales of passenger cars and commercial vehicles."

In response to requests for admissions, Mazda Japan freely admitted that its vehicles are "intended for the United States Market, <u>including Florida</u>." (emphasis added). In the Company Profile, Mazda Japan reported the growth of sales of Mazda vehicles in the U.S.: 2012 – 273, 307; 2013 – 283, 721; 2014 – 305, 788; 2015 – 305, 783; 2016 – 302, 195; and 2017 – 304, 394. The Profile has a section entitled "Reforming Our Sales Network (For the US Market)." "We have," the Profile stated, "been focusing on reforming our sales network in the United States and other areas while enhancing customer care and developing new-generation dealerships." "We are planning to develop a new marketing strategy that is adapted to the characteristics of the US market, which is crucial for Mazda, in order to build a sales system with a goal set at 400,000 units for 2021."

6

The Company Profile reported that Mazda Japan's Executive Vice President, Mr. Kiyoshi Fujiwara, is responsible for "oversight of operations in North America." In the Profile, Mazda Japan stated it had a U.S. product lineup consisting of 6 makes of vehicles. It numbered its U.S. dealerships at 582. Elsewhere, it named Mazda North America as "the authorized distributor of Mazda brand vehicles in the United States." Among other things, Mazda Japan reported it had research and development facilities in California and Michigan, operated by Mazda North America.

Declarations and responses to request for admissions provided further information. Mazda Japan designed vehicles to comply with U.S. regulations. Mazda Japan has registered trademarks with the U.S. Patent and Trademark Office for the following: "Mazda," "MazdaUSA," "Zoom-Zoom," "Mazda Dealer Online," "Reward Performance by Mazda," "RPM Reward Performance by Mazda," "Mazda Zero to Drive Event," and "Mazda Capital Services." Mazda Japan provided the warranties, at least in part, for Mazda vehicles sold in the U.S.

Mazda Japan has shipped at least 493 vehicles to Florida ports during the period 2006 to 2020. These vehicles were sold to Mazda North America, f/o/b Mexico or f/o/b Japan. In December 2015, Mazda Japan showcased how its designs combine Japan's famous aesthetics with advanced

7

ergonomics at an event in Miami, Florida. Illustrating Mazda Japan's ongoing involvement with vehicles sold in the U.S. and Florida, on many occasions, Mazda Japan ordered recalls of Mazda vehicles including recalls of the make and model of the car at issue and recalls specifically naming Florida.

**ANALYSIS**

**1.    Determining factual basis for deciding motions to dismiss for lack of personal jurisdiction**

We have explained the procedure for establishing the facts regarding claims of personal jurisdiction as follows:

> If the allegations in the complaint sufficiently establish long-arm jurisdiction, then the burden shifts to the defendant to contest the jurisdictional allegations in the complaint, or to claim that the federal minimum contacts requirement is not met, by way of affidavit or other similar sworn proof. If properly contested, the burden then returns to the plaintiff to refute the evidence submitted by the defendant, also by affidavit or similar sworn proof.
>
> The trial court can resolve the jurisdictional question solely on the basis of the affidavits, so long as they do not conflict. If the affidavits do conflict, however, then the trial court must conduct a limited evidentiary hearing to resolve the factual dispute.

Belz Investco Ltd. P'ship v. Groupo Immobiliano Cababie, S.A., 721 So. 2d 787, 789 (Fla. 3d DCA 1998) (citations omitted). In most cases, however, "the affidavits can be harmonized." Estes v. Rodin, 259 So. 3d 183, 190 (Fla. 3d DCA 2018).

8

Here, neither party requested an evidentiary hearing, raised the lack of an evidentiary hearing as a ground for error, or contended an actual conflict existed in the specific facts presented by the parties. In these circumstances, the plaintiff continues to bear the burden of presenting facts that support a prima facie case of jurisdiction. However, since the posture of the case is a motion to dismiss without an evidentiary hearing, the facts presented by the plaintiff must be taken as true and the plaintiff is entitled to all reasonable inferences from those facts.[1] Once the factual basis for the motion is established, the legal question of whether the facts are sufficient to make a prima facie case for jurisdiction is reviewed de novo. Highland Stucco & Lime Prods., Inc. v. Onorato, 259 So. 3d 944, 947 (Fla. 3d DCA 2018).

---

[1] Hawkins v. i-TV Digitalis Tavkozlesi zrt., 935 F.3d 211, 226–27 (4th Cir. 2019) ("When personal jurisdiction is addressed under [a motion to dismiss] without an evidentiary hearing, the party asserting jurisdiction has the burden of establishing a *prima facie* case of jurisdiction . . . . That is, the [trial] court must determine whether the facts proffered by the party asserting jurisdiction—assuming they are true—make out a case of personal jurisdiction over the party challenging jurisdiction. Unlike [when considering a motion to dismiss for failure to state a cause of action], the court may also consider affidavits submitted by both parties, although it must resolve all factual disputes and draw all reasonable inferences in favor of the party asserting jurisdiction. The existence of a *prima facie* case of jurisdiction is a question of law we review de novo." (citations omitted)). See generally The Florida Bar v. Greene, 926 So. 2d 1195, 1199 (Fla. 2006) (In the posture of a motion to dismiss, the nonmovant's allegations must be taken as true and "all reasonable inferences therefrom construed in favor of the nonmoving party.").

## 2.    Due Process and Specific Personal Jurisdiction

The main issue before us is whether Mazda Japan's contacts with Florida are sufficient to establish specific or case-linked jurisdiction that would allow Florida to offer its resident a convenient forum to redress the injuries caused to the decedent by Mazda Japan's allegedly defective design of the vehicle at issue.[2] To resolve this issue we must interpret the due process clause of the Fourteenth Amendment to the U.S. Constitution.

Under the due process clause of the Fourteenth Amendment, a State without general jurisdiction over a defendant may still exercise specific jurisdiction to hear the specific claim against the defendant presented by the case before it in certain circumstances. For due process to be satisfied by a court's exercise of specific jurisdiction over a defendant located outside its territory, the defendant's contacts must meet three conditions. First, the contacts must involve "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . , thus

---

[2] The general background law concerning personal jurisdiction is well established and we will not rehearse it here. See, e.g., Highland Stucco, 259 So. at 947. At the outset, we narrow our analysis in three ways. First, Mazda Japan concedes for the purposes of this appeal that the requirements of the long arm statute are met. Next, we summarily reject the claim that Mazda Japan's contacts with Florida are sufficient to subject it to general jurisdiction. Finally, we note Plaintiff dropped any claim to "pierce the corporate veil" between Mazda Japan and Mazda North America.

invoking the benefits and protections of its laws." <u>Hanson v. Denckla</u>, 357 U.S. 235, 253 (1958); <u>see also</u> <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 475 (1985). Second, the contacts must be related to the plaintiff's cause of action or have given rise to it. <u>Ford Motor Co.</u>, 141 S. Ct. at 1019. Third, the defendant's contacts with the forum must be "such that [the defendant] should reasonably anticipate being haled into court there." <u>World–Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 297 (1980).

### 3. "Purposeful Availment"

A State cannot assert case-specific personal jurisdiction over a foreign defendant merely because the foreign defendant's product appears in the State's territory and injures one of its residents. Nor can a State assert personal jurisdiction over a foreign defendant merely because the foreign defendant placed its product in the global stream of commerce without any actions by the foreign defendant to access the State's markets. This is true even if the foreign defendant, in placing its product in the stream of commerce, could foresee or predict that the product would reach the markets of the forum State. <u>J. McIntyre Mach., Ltd. v. Nicastro</u>, 564 U.S. 873, 882 (2011) (observing "it is not enough that the defendant might have predicted that its goods will reach the forum State.") (Kennedy J., plurality opinion).

11

Due process, however, allows a State to assert specific personal jurisdiction over a foreign defendant when that foreign defendant has "purposefully availed" itself of the benefits of the laws and markets of the forum State. "In other words, submission through contact with and activity directed at a sovereign may justify specific jurisdiction in a suit arising out of or related to the defendant's contacts with the forum." Id. at 881 (internal quotation marks omitted).

The targeting required for "purposeful availment" may be done "directly or indirectly." In a comment remarkably pertinent to this case, the Supreme Court has explained, "if the sale of a product of a [foreign] manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others." World-Wide Volkswagen Corp., 444 U.S. at 297 (emphasis added).

To a great extent, the law in this area derives from the reasoning of seminal Supreme Court case on specific jurisdiction, Asahi Metal Indus. Co. v. Superior Court of California, Solano City, 480 U.S. 102, 112 (1987). Asahi involved an attempt by a California court to assert jurisdiction over a

12

Japanese manufacturer of tire assemblies who sold its product to a separate corporation in Taiwan, which then incorporated the assemblies into motorcycles and sold them in California. Id. at 106-07. The plaintiff claimed specific jurisdiction in California on the basis that the defendant had placed a product in the steam of commerce with knowledge that the product would eventually find its way to California. Id. A plurality of the Supreme Court squarely rejected this argument: "The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." Id. at 112.

In rejecting specific jurisdiction in that case, however, the Court emphasized that the defendant "did not create, control, or employ the distribution system that brought its valves to California. [And] [t]here is no evidence that [the defendant] designed its product in anticipation of sales in California." Id. at 112–13 (citations omitted). The Court took pains to note that the result would be different if the defendant's conduct had included "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." Id. at 112.

This "additional conduct of the defendant" is a basis for specific jurisdiction because it "indicat[es] an <u>intent or purpose</u> to serve the market in the forum State," <u>id.</u>; or indicates that the product is "<u>purposely directed</u> toward the forum State," <u>id.</u> (emphasis added); or is "<u>targeted</u>" at the forum State, <u>J. McIntyre Mach., Ltd.</u>, 564 U.S. at 877 (emphasis added). "The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct." <u>J. McIntyre Mach., Ltd.</u>, 564 U.S. at 884.

In sum, the U.S. Supreme Court has identified the following conduct as examples of "additional conduct" indicating an intent or purpose to serve the market in the forum State: (1) sending products to the forum State;[3] (2) "designing the product for the market in the forum State;" (3) "advertising in the forum State"; (4) "establishing channels for providing regular advice to customers in the forum State;" (5) "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State;"[4]

---

[3] <u>J. McIntyre Mach., Ltd.</u>, 564 U.S. at 882 ("Sometimes a defendant [submits to the jurisdiction of the forum state by] sending its goods rather than its agents.")

[4] <u>Asahi Metal Indus. Co.</u>, 480 U.S. at 112.

and (6) the sale of the product in the forum State is "not simply an isolated occurrence."[5]

Mazda Japan contends that these types of actions may have been taken by its American subsidiary but were not taken by Mazda Japan. Applying these criteria, however, we are persuaded that the record in this case supports a reasonable inference that Mazda Japan itself has purposefully availed itself of the markets of the U.S. and Florida. Mazda Japan—not its American subsidiary—developed lines of vehicles, including the subject vehicle, for the U.S. market. Mazda Japan—not its American subsidiary—designed those vehicles to comply with U.S. regulations. Mazda Japan—not its American subsidiary—registered and owns the U.S. trademarks under which these vehicles are marketed and sold in the U.S. and Florida. Mazda Japan—not its American subsidiary—in its annual reports, states its goals for sales in the U.S. Mazda Japan—not its American subsidiary—announced *its* plans to improve the Mazda sales force, Mazda franchises, and Mazda marketing strategy "adapted to the characteristics of the US market," which, it announced was "crucial for Mazda [Japan]." Mazda Japan, in an ongoing relationship with its customers, ordered multiple recalls from Japan.

_____

[5] World-Wide Volkswagen Corp., 444 U.S. at 297.

15

In these matters, Mazda Japan made clear that Florida—the third largest State in the U.S. and presumably the third largest car market—was specifically being targeted. Mazda Japan admitted that its vehicles are "intended for the United States market, including Florida." It also backed up these words with direct contacts with Florida. It shipped hundreds of vehicles to Florida. From Japan it ordered recalls, expressly naming and including Florida, which is evidence of Mazda Japan's efforts to foster an ongoing relationship with the owners of its cars in Florida. It promoted its new design concepts at an event in Florida.

If not Florida, what market were these actions of Mazda Japan intended to reach? Put another way, if not to serve the State's market, what was the purpose of Mazda Japan designing vehicles for, shipping vehicles to, and continuing to provide technical support in the form of recalls for its vehicles owned in Florida? Whatever other markets Mazda Japan was targeting, these circumstances support a reasonable inference that Mazda Japan targeted its vehicles toward Florida, which is all the Plaintiff must show to overcome a motion to dismiss.

While these facts alone are sufficient to support a reasonable inference that Mazda Japan is targeting the U.S. and Florida market, there is an additional fact that does so. As mentioned above, one of the factors the U.S.

16

Supreme Court identified as "additional conduct" indicating a foreign defendant's "intent or purpose to serve the market in the forum State" justifying specific jurisdiction is "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State."[6]

Under this law, courts have found that a defendant had "purposefully availed" itself of the privilege of doing business within a jurisdiction when the defendant had not itself marketed products in the jurisdiction but had entered into an exclusive agreement with a third party to market its product within the jurisdiction. For example, in <u>Vermeulen v. Renault, U.S.A., Inc.</u>, 985 F.2d 1534, 1550 (11th Cir. 1993), the Eleventh Circuit found that Renault, a French corporation that did not itself do business in the U.S., was subject to personal jurisdiction because Renault had entered into an exclusive marketing agreement with a third party that "targeted its LeCars toward the United States." In these circumstances, Renault "fairly could expect to defend in this country the very type of action this case presents: a personal injury action challenging the car's design and safety." <u>Id.</u>

What is true for an agreement with a third party is even more true for use of a wholly owned subsidiary created for the purposes of marketing a

---

[6] <u>Asahi Metal Indus. Co.</u>, 480 U.S. at 112.

17

product within a jurisdiction. Indeed, "[m]any courts have held that a foreign manufacturer that utilizes an American subsidiary to target distribution of its product to the forum State is appropriately subject to those states' jurisdiction." Lewis v. Mercedes-Benz USA, LLC, 530 F. Supp. 3d 1183, 1239 (S.D. Fla. 2021).

In facts remarkably similar to this case, the court in Lewis found that the German corporation, Daimler AG, while not itself doing business in Florida, had nevertheless purposefully availed itself of the Florida market for cars by creating a wholly owned subsidiary to market its cars in Florida and actively supporting its subsidiary's marketing of the cars in Florida by, among other things, licensing the subsidiary to use its trademarks registered in the U.S. Patent and Trademark Office. Id. The Court explained, "Daimler's utilization of its [American] subsidiary MBUSA to cultivate business in Florida, which included licensing its trademarks to MBUSA as well as to dealerships in the State of Florida, properly subjects Daimler to the jurisdiction of Florida courts." Id. (collecting and discussing cases).[7] See also Thurman v. Am. Honda Motor Co., Inc., No. 22-CV-04007-WJE, 2022 WL

_____

[7] The court considered the reach of personal jurisdiction under Florida law because federal courts sitting in diversity look to state law to determine personal jurisdiction. Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc., 593 F.3d 1249, 1257-58 (11th Cir. 2010).

18

4292331, at *3-4 (W.D. Mo. Sept. 16, 2022) (same); <u>Opheim v. Volkswagen Aktiengesellschaft</u>, No. 20-CV-02483-KM-ESK, 2021 WL 2621689, at *4 (D.N.J. June 25, 2021) (same); <u>Hatton v. Chrysler Canada, Inc.</u>, 937 F. Supp. 2d 1356, 1366 (M.D. Fla. 2013) (same).

Applying this law, Mazda Japan's act of creating, deputizing, and utilizing Mazda North America qualifies as "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." <u>Asahi Metal Indus. Co.</u>, 480 U.S. at 112. It therefore provides more "additional conduct" of the type that the Supreme Court identified as necessary to establish specific jurisdiction in <u>Asahi</u>. <u>Id.</u> at 112–13.[8]

We believe this conclusion is consistent with <u>Kellogg-Borchardt v. Mazda Motor Corp.</u>, No. 18-CV-01105-JHR-KK, 2019 WL 2189527, at *4 (D.N.M. May 21, 2019), which held that Mazda Japan was not subject to the personal jurisdiction of the courts in New Mexico on a very different record. In <u>Kellogg-Borchardt</u>, there was "no information in the record that indicate[d] how the vehicle came to be in New Mexico." <u>Id.</u> at *5. Here, Mazda Japan

---

[8] While the record before us does not include an express agreement to market as in <u>Vermeulen</u> and <u>Lewis</u>, <u>see</u> <u>Vermeulen</u>, 985 F.2d at 1549; <u>Lewis</u>, 530 F. Supp. 3d at 1237, this absence is made up by the explicit statements in Mazda Japan's Annual Reports regarding Mazda Japan's use of Mazda North America to accomplish its intermediate and long-term marketing goals and by Mazda Japan's own actions regarding Florida.

19

shipped the vehicle to the U.S. where it was purchased by the decedent from a Mazda-branded dealer in Florida. Also, the record in Kellogg-Borchardt failed to "indicate whether [Mazda Japan] play[ed] any role in directing marketing to particular states." Id. at *4. As discussed above, Mazda Japan admitted it intended its vehicles for Florida and had various contacts indicating an intent to promote its vehicles in Florida that it did not have with New Mexico.

In sum, we find Mazda Japan has purposefully availed itself of the privilege of conducting business in Florida because it directed the distribution of its vehicles to the State and sold Florida residents its cars through its distributor Mazda North America at a Mazda-branded dealership in Florida. This is not the case of mere "placement of a product into the stream of commerce, without more." Asahi Metal Indus. Co., 480 U.S. at 112.

#### 4.    "Arise Out of or Relate To"

The second condition required by due process for specific jurisdiction is that the dispute must "arise out of or relate to" the non-resident defendant's contacts with the forum State. This requirement was recently discussed in Ford Motor Company, 141 S. Ct. at 1019. In Ford, the Court examined whether Montana and Minnesota had properly asserted personal jurisdiction over Ford. Id. at 1023-24. The case arose from separate lawsuits in which

20

State residents sued Ford for defective designs concerning car accidents within those States. Id. Ford had dealers that sold vehicles in those States, advertised in those States, and generally encouraged residents to buy and drive Ford vehicles. Id. at 1022-23. Ford conceded that it had purposefully availed itself of the privilege of conducting business in those States. Id. at 1026. Ford's argument was that the "arise out of or relate to" prong required the plaintiffs to show that the disputes at issue would not have occurred "but for" Ford's contacts with the States. Id. This high causation requirement could not be shown, Ford maintained, because Ford had designed, manufactured, and sold the cars at issue not in Montana or Minnesota, but in other States. Id.

The Court unanimously rejected Ford's argument. Writing for the majority, Justice Kagan noted that the traditional statement of this prong did not limit jurisdiction to cases that "arose out of" the non-resident defendant's contacts, but also recognized jurisdiction that simply "related to" those contacts. Id. She found that the disputes, although not directly stemming from Ford's contacts in a "but for" manner, nevertheless "related to" those contacts because "by making it easier to own a Ford, [the contacts] encourage Montanans and Minnesotans to become lifelong Ford drivers." Id. at 1028.

As discussed above, we determined that Mazda Japan purposefully availed itself of the Florida market for vehicles in numerous ways. Under the law described above, we conclude that the Plaintiff's claims in this case arise out of or relate to Mazda Japan's contacts with Florida, all of which related to facilitating the sale of its vehicles in Florida. Indeed, as noted previously, Ford stated that a case where "a resident-plaintiff sues a global car company, extensively serving the state market in a vehicle, for an in-state accident." was a "paradigm example of how specific jurisdiction works." Id.

### 5. "Fair Play and Substantial Justice"

In products liability cases like this one, where the plaintiff is a State resident who purchased a vehicle in State and was damaged by the allegedly defective design of a vehicle in an accident that occurred on the roads or highways of a State, a finding that the defendant purposefully availed itself of the State's markets goes a long way toward establishing that personal jurisdiction is consistent with "traditional notions of fair play and substantial justice." J. McIntyre Mach., Ltd., 564 U.S. at 880 ("In products-liability cases like this one, it is the defendant's purposeful availment that makes jurisdiction consistent with 'traditional notions of fair play and substantial justice.'").

Once it is established that the non-resident defendant purposefully availed itself of the market (and therefore the laws) of a State, the interest of

22

the State to oversee the safety of its residents within the State is obvious and compelling. As Justice Alito wrote in his concurrence in Ford regarding the interests of Minnesota and Montana to assert jurisdiction over the wrongful death actions in those cases, "[t]heir residents, while riding in vehicles purchased within their borders, were killed or injured in accidents on their roads. Can anyone seriously argue that requiring Ford to litigate these cases in Minnesota and Montana would be fundamentally unfair?" Ford Motor Co., 141 S. Ct. at 1032 (Alito, J. concurring). See also id. at 1030. ("States have significant interests at stake—'providing [their] residents with a convenient forum for redressing injuries inflicted by out-of-state actors,' as well as enforcing their own safety regulations.").

## CONCLUSION

For the reasons stated above, we conclude that the trial judge was eminently correct in finding that the jurisdictional allegations and facts in this case support a determination that Mazda Japan had sufficient contacts with Florida for a Florida court to assert personal, case-specific jurisdiction in this matter.

Affirmed.

23

LINDSEY, J., concurring.

I agree that on the facts before us, Appellant Mazda Motor Corporation ("Mazda Japan") has sufficient minimum contacts with Florida to subject it to specific jurisdiction here.[9]  I acknowledge the precise contours of personal jurisdiction are at times unclear.  See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1039 (2021) (Gorsuch, J., concurring) ("The real struggle here isn't with settling on the right outcome in these cases, but with making sense of our personal jurisdiction jurisprudence . . . .").  But nothing in the Due Process Clause or controlling case law demands that we insulate Mazda Japan, a global automobile company, from liability in the underlying action.

Recently, the United States Supreme Court reaffirmed its conclusion in World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) that "if the sale of a product of a manufacturer or distributor such as Audi [a

---

[9] I fully agree with my colleagues that Mazda Japan cannot be subject to general jurisdiction in Florida because its contacts are not so continuous and systematic as to render it essentially at home in this State.  See, e.g., Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011) ("A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State.").

German automobile manufacturer] or Volkswagen [Audi's nationwide importer] is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others." Ford, 141 S. Ct. at 1027. Importantly, specific jurisdiction "is not limited to where the car was designed, manufactured, or first sold." Id. at 1028.

Here, the sale of Mazda Japan-designed vehicles in Florida is not an isolated occurrence. To the contrary, Mazda vehicles are sold throughout Florida because Mazda Japan designs its vehicles for the U.S. market, which it serves, albeit indirectly, through an authorized U.S. distributor and authorized Mazda dealers. In other words, the vehicles Mazda Japan designs do not end up in Florida as the result of random, fortuitous, or attenuated contacts or of the unilateral activity of another party or a third person. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) ("This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts . . . or of the 'unilateral activity of another party or a third person[.]'" (citations omitted)).

Under the dissent's approach, a global automobile company, like Mazda Japan, that designs its vehicles for the United States and unquestionably serves the U.S. market with hundreds of thousands of Mazda Japan-designed vehicles each year[10] could not be sued in *any* state.[11] This cannot be, even under the "stream of commerce plus" test, which requires more than merely placing a product into the stream of commerce. I write separately to more fully explain why I believe Mazda Japan is subject to specific jurisdiction in this case, even under the more demanding stream of commerce plus test.

The dissent primarily relies on three cases to explain the stream of commerce plus test. The first case involved Asahi, a Japanese manufacturer

_____

[10] According to the record, Mazda Japan had a U.S. market sales goal of 400,000 units for 2021.

[11] The dissent's approach only insulates foreign-country automobile companies from liability. But similarly situated domestic global automobile competitors, like Ford, would still be subject to jurisdiction. See Ford, 141 S. Ct. at 1032 (Alito, J., concurring) ("Since International Shoe, the rule has been that a state court can exercise personal jurisdiction over a defendant if the defendant has minimum contacts with the forum—which means that the contacts must be such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. That standard is easily met here. . . . In entertaining these suits, [the target forum's] courts have not reached out and grabbed suits in which they have little legitimate interest. Their residents, while riding in vehicles purchased within their borders, were killed or injured in accidents on their roads. Can anyone seriously argue that requiring Ford to litigate these cases in [the target forums] would be fundamentally unfair?" (citations and internal quotation marks omitted)).

of tire valves that were sold to several manufacturers of finished tire tubes, including a Taiwanese manufacturer. Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty., 480 U.S. 102, 106 (1987). The total sales of tire valves to the Taiwanese tube manufacturer amounted to no more than 1.24 percent of Asahi's yearly income during the relevant period. Id. The Taiwanese tube manufacturer, which also used valves from other manufacturers, sold some of its finished tubes in the United States (approximately 20 percent of sales). Id. Asahi's representatives admitted to knowing that some of the valves it sold to the Taiwanese tube manufacturer would make their way to the United States (and to California in particular), but Asahi never contemplated that its limited sales of valves to the Taiwanese tube manufacturer would subject it to a lawsuit in California. Id. at 107.

Justice O'Connor's plurality[12] held that Asahi's mere placement of valves into the stream of commerce, without additional conduct, did not subject it to jurisdiction in California, even though some of its valves

_____

[12] A unanimous Court agreed that California's "exercise of personal jurisdiction over [Asahi] would be unreasonable and unfair in violation of the Due Process Clause." Asahi, 480 U.S. at 102. But competing pluralities disagreed over the interpretation of the stream of commerce test. Justice O'Connor's plurality essentially adopted a stream of commerce plus test. Id. at 103-04. Justice Brennan's plurality disagreed with this approach. Id. at 104.

ultimately ended up there.  Id. at 112.  "Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State."  Id.

The second case the dissent relies on was a products liability action in New Jersey involving a metal-shearing machine manufactured by J. McIntyre in England.  J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 886 (2011).  "[A]fter discovery the trial court found that '[J. McIntyre] does not have a single contact with New Jersey short of the machine in question ending up in this state.'"[13]  Id.

A majority held that there could be no jurisdiction over J. McIntyre. Consistent with Asahi, a plurality, authored by Justice Kennedy, held that J. McIntyre did not have sufficient minimum contacts with New Jersey because the record reflected there was no additional conduct apart from placing its

---

[13] According to the record, only one machine ended up in New Jersey, but there were perhaps more.  At most, four machines made their way to New Jersey.  Id. at 878.

machines in the stream of commerce indicating intent or purpose to serve New Jersey.[14]  Id. at 887.

In addition to Asahi and J. McIntyre, the dissent also relies on a case from this Court in support of its application of the stream of commerce plus test: Highland Stucco & Lime Prod., Inc. v. Onorato, 259 So. 3d 944 (Fla. 3d DCA 2018).  Highland Stucco was a products liability case involving a California manufacturer ("Highland") of asbestos-containing products.  Id. at 946.  The record reflected that "[t]he overwhelming majority of HIGHLAND's business was conducted in California. During the time period when HIGHLAND used asbestos, its products were primarily sold to building supply dealers within a 60 mile radius of its Van Nuys, California plant."  Id. at 947.  This Court, relying on the plurality opinion in J. McIntyre, held that "[i]t is not enough that Highland's products may have found their way into Florida or that Highland may have predicted that they might reach Florida, as foreseeability that a product may find its way into a forum state is not

_____

[14] Justice Breyer, joined by Justice Alito, concurred in the judgment but did not join the plurality's "strict rules that limit jurisdiction where a defendant does not 'inten[d] to submit to the power of a sovereign' and cannot 'be said to have targeted the forum.'"  Id. at 890 (Breyer, J., concurring).  According to the concurrence, there was no need to create a new rule because the outcome was determined by existing precedent: "None of our precedents finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient. Rather, this Court's previous holdings suggest the contrary."  Id. at 888.

enough, by itself, to allow that state to constitutionally exercise jurisdiction over an out-of-state defendant." Id. 950.

What is clear from the two United States Supreme Court plurality opinions—Asahi and J. McIntyre—and this Court's Highland Stucco opinion is that the stream of commerce plus test has been developed at the margins of personal jurisdiction jurisprudence. All three cases involved relatively small manufacturers, foreign to the target forum, that merely placed products in the stream of commerce, a miniscule number of which ended up in the target forum. This is not one of those cases. Mazda Japan is a global automobile company, and its vehicles do not end up in Mazda dealerships all over Florida by happenstance.

The record reflects that Mazda Japan designs vehicles for the U.S. market, and its annual reports reflect sales goals of hundreds of thousands of vehicles in this country. Even if Mazda Japan does not directly control Mazda North America, its authorized U.S. distributor, or the authorized Mazda dealerships in Florida, the sale of Mazda vehicles in Florida is not an isolated occurrence but undoubtedly arises, even if indirectly, from Mazda Japan's efforts to serve the Florida market. Cf. Ford, 141 S. Ct. at 1027 ("[I]f the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or

30

distributor to serve, directly or indirectly, the market for its product in [several or all] other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others." (quoting World-Wide Volkswagen, 444 U.S. at 297)).

This is true even under the more rigorous stream of commerce plus test, which requires more than simply placing a product in the stream of commerce. See Asahi, 480 U.S. at 112 ("Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.").

Nothing in the Due Process Clause or controlling case law demands insulating a foreign global automobile company like Mazda Japan from liability when it purposefully avails itself of the privilege of selling vehicles, directly or indirectly, in this State. I therefore concur in affirming the order on appeal.

31

LOBREE, J., dissenting.

I respectfully dissent from the decision to affirm the order denying Mazda Japan's motion to dismiss for lack of personal jurisdiction, essentially on two bases. In my view, the majority misplaces its reliance on the Supreme Court's statement in Ford Motor Co. v. Montana Eighth Judicial District Court, 141 S. Ct. 1017, 1028 (2021), that "this Court has used this exact fact pattern (a resident-plaintiff sues a global car company, extensively serving the state market in a vehicle, for an in-state accident) as an illustration—even a paradigm example—of how specific jurisdiction works." This statement was made in the context of the "arise out of or relate to" factor of the personal jurisdiction inquiry. Unlike Mazda Japan, the defendant in Ford Motor Co. conceded purposeful availment as it had a "veritable truckload of contacts" with the forum states' markets, and "[t]he only issue [in the case was] whether those contacts [were] related enough to the plaintiffs' suits." Id. at 1031.

Further, I disagree with the majority's view of the record, in particular, the characterization of Mazda Japan as having *directed the distribution* of its vehicles to Florida. This finding is not supported by the record. While 493 vehicles were offloaded at the Port of Jacksonville—with Mazda North

32

America as the importer—there is no evidence that Mazda Japan controlled or decided whether its vehicles would be offloaded and distributed into this state, its designation as the "shipper" in a compilation of U.S. Custom's data notwithstanding.  As detailed below, I do not believe that the evidence relied on by the plaintiff demonstrates under our current personal jurisdiction jurisprudence that Mazda Japan has purposefully availed itself of the privilege of conducting business in Florida.  Thus, on this record, I agree with Mazda Japan's contention that it lacks sufficient minimum contacts with Florida to comport with the constitutional standard for exercising specific jurisdiction over nonresident defendants.

**FACTUAL AND PROCEDURAL HISTORY**

As the majority states, Mazda Japan supported its motion to dismiss the second amended complaint for lack of personal jurisdiction with affidavits from Osamu Yamashina.  In addition to the averments relied upon by the majority, notably Yamashina also averred that Mazda Japan "had no involvement with the manufacture, assembly, wholesale distribution to the retail dealer, marketing, retail sale, warranty administration, service or maintenance" of the vehicle at issue.  In his second affidavit, Yamashina further averred that:

> • After assembly, the vehicle was sold to Mazda North America in Mexico and shipped to the United States f.o.b. Mexico;

33

• The vehicle was imported to the United States by Mazda Motor of America, Inc. d/b/a Mazda North America;

• Mazda North America distributed the vehicle to an independent dealer;

• Mazda Japan had no involvement with the importation, distribution, or retail sale of the vehicle;

• Mazda Japan had no control over the distribution of the vehicle within the United States;

• Mazda Japan has no involvement in Mazda North America's decision into which states to distribute vehicles purchased from Mazda Japan and does not advise Mazda North America into which states to distribute vehicles;

• Mazda Japan does not advertise or market its products in Florida or to Florida residents;

• The Mazda dealer network in the United States has been established by Mazda North America and is managed by Mazda North America.

The plaintiff and decedent's personal representative, Lourdes Triche, responded to Mazda Japan's motion to dismiss by asserting that Mazda Japan had sufficient minimum contacts with Florida because it had "engaged in substantial business in Florida." As evidence of that "substantial business," Triche pointed to: (1) Mazda Japan's shipment of goods into Florida ports; (2) the admitted fact that Mazda Japan decides whether to initiate recalls of vehicles; (3) Mazda Japan's stated goal of working with U.S. dealerships to increase sales; (4) the admitted facts that Mazda Japan owns

Mazda-related U.S. trademarks and designs vehicles to comply with U.S. regulations; as well as (5) "miscellaneous connections," like Mazda Japan displaying its "Bike by KODO Concept" and "Sofa by KODO Concept" car in Miami to highlight its KODO-Soul in Motion design theme. Triche relevantly supported her response with the affidavit of Nickie Bonenfant, the chief operating officer at ImportGenius, a company that provides data from U.S. Customs agencies and U.S. Customs Bills of Lading; annual reports, company profiles and a sustainability report of Mazda Japan; recall notifications to the National Highway Traffic Safety Administration ("NHTSA"); and U.S. trademark registrations.

In denying Mazda Japan's motion to dismiss, the trial court focused primarily on the global aspects of Mazda Japan's business, considering a pronouncement by Mazda Japan's president and CEO in a 2016 sustainability report that "Mazda sells vehicles in more than 130 countries and regions, and has production sites in seven countries around the world" to be "very important," because it did not distinguish between Mazda Japan and Mazda North America. The trial court further asserted it did not think Mazda Japan and Mazda North America are "really separate and distinct."

## ANALYSIS

On appeal, Mazda Japan focuses primarily on the "purposeful availment" factor of the minimum contacts analysis, asserting that Triche failed to establish that Mazda Japan purposefully availed itself of the privilege of conducting business in Florida.  Advancing a stream of commerce theory, Triche responds that Mazda Japan placed the vehicle into the stream of commerce with the expectation it would end up in Florida, and that she presented evidence showing that Mazda Japan "**purposeful[ly] target[ed]** . . . Florida for its own business endeavors."  Pl.'s Suppl. Mem. Supp. Personal Juris. 13.

The constitutional prong of our long-arm personal jurisdiction analysis "is controlled by United States Supreme Court precedent interpreting the Due Process Clause." Highland Stucco & Lime Prods. Inc. v. Onorato, 259 So. 3d 944, 950 (Fla. 3d DCA 2018).  Indeed, "[t]he Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts."  Walden v. Fiore, 571 U.S. 277, 283 (2014).  "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."  Id. at 284.  For that reason, "the nonresident generally must have 'certain minimum contacts . . . such that the

36

maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" Id. at 283 (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)); see also Kulko v. Superior Ct. of California, City & Cnty. of San Francisco, 436 U.S. 84, 92 (1978).

"In products liability cases like this one, it is the defendant's purposeful availment that renders jurisdiction consistent with 'traditional notions of fair play and substantial justice.'" Highland Stucco, 259 So. 3d at 950 (quoting J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 880 (2011)). "[W]here the defendant 'deliberately' has engaged in significant activities within" the forum state, or "has created 'continuing obligations' between himself and residents of" the forum state, the defendant purposefully availed itself of the privilege of conducting business within the forum, "and because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475–76 (1985). In other words, the nonresident's actions must be "*purposefully directed*" toward the forum state. Id. at 476 (emphasis added).

In the personal jurisdiction context, the stream of commerce theory originated with the United States Supreme Court's statement in World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286 (1980), that a forum state

"'does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State' and those products subsequently injure forum consumers." Burger King, 471 U.S. at 473 (quoting World-Wide Volkswagen, 444 U.S. at 297–98). The Supreme Court subsequently addressed the stream of commerce theory again in Asahi Metal Industry Co. v. Superior Court of Cal., Solano Cnty., 480 U.S. 102 (1987). There, in a fractured decision, the plurality opinion stated that "[t]he 'substantial connection,' between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State*." Id. at 112 (citation omitted) (quoting Burger King, 471 U.S. at 475). "The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State . . . ." Id. "Such [additional] conduct could include 'designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve

38

as the sales agent in the forum State.'"   Shin-Kobe Elec. Mach. Co. v. Rockwell, 750 So. 2d 67, 69 (Fla. 2d DCA 1999) (quoting id.).

Later, in J. McIntyre, Justice Kennedy's plurality opinion espoused what is often cited as the "stream of commerce plus" test, see In re Chinese-Manufactured Drywall Prods. Liability Litigation, 753 F.3d 521, 540 (5th Cir. 2014), stating that "[t]he defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have *targeted the forum*; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." 564 U.S. at 882 (emphasis added).   The plurality further explained that "[t]his Court's precedents make clear that it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment." Id. at 883.

While neither Asahi nor J. McIntyre commanded a majority opinion on the stream of commerce theory, when confronted with the issue, this court leaned toward the stream of commerce standard set forth in the J. McIntyre plurality.  Specifically, in Highland Stucco, this court followed the Supreme Court's most recent pronouncement on the stream of commerce theory, and stated that "[i]t is not enough that [defendant manufacturer's] products may have found their way into Florida or that [defendant manufacturer] may have predicted that they might reach Florida, as foreseeability that a product may

39

find its way into a forum state is not enough, by itself, to allow that state to constitutionally exercise jurisdiction over an out-of-state defendant." 259 So. 3d at 950. Because the plaintiff did not present evidence that the nonresident defendant manufacturer "directed its product into Florida for distribution" and never "conducted business in Florida, advertised in a Florida publication, nor manufactured, sold, distributed, or supplied any products" in Florida, we concluded that "the plaintiffs failed to demonstrate that [the defendant] purposefully availed itself of the privilege of conducting business within the state such that it reasonably could have anticipated being haled into court in this state." Id. at 951. At least two of our sister courts seemingly agree and follow the plurality's statement in J. McIntyre that in the stream of commerce context, a nonresident defendant purposefully avails itself of the privilege of conducting activities in the forum state only when it "can be said to have targeted the forum." 564 U.S. at 882; see Robinson Helicopter Co. v. Gangapersaud, 346 So. 3d 134, 142 (Fla. 2d DCA 2022); Imerys Talc Am. V. Ricketts, 262 So. 3d 799, 803–04 (Fla. 4th DCA 2018); S. Wall Prods., Inc. v. Bolin, 251 So. 3d 935, 939–40 (Fla. 4th DCA 2018). Thus, under this court's precedent, foreseeability alone does not govern whether a nonresident defendant manufacturer purposefully availed itself of the

privilege of conducting business in Florida. Instead, it must have engaged in actions targeting Florida.

Applying these principles, I conclude that Mazda Japan did not purposefully avail itself of the privilege of conducting business in Florida such that it should reasonably anticipate being haled into our courts. As below, Triche claims that the following evidence shows that personal jurisdiction over Mazda Japan in Florida is proper: (1) Mazda Japan's annual reports and company profiles that "espouse lofty sales goals" for the United States' market; (2) Mazda Japan's United States trademarks on marketing phrases, such as "Zoom-Zoom" and "Mazda Zero to Drive Event"; (3) Mazda Japan's admission that it designs vehicles to comply with United States regulations; (4) Mazda Japan's display of a concept car (designed as a sofa) and bicycle at a two-day art show in Miami in 2015; (5) the fact that Mazda North America is the authorized distributor for Mazda vehicles in the United States; (6) Mazda Japan's admission that it makes recall determinations for cars in the United States; and (7) Mazda Japan's identification as the "shipper" on a compilation of data from United States Customs agencies listing shipments of Mazda vehicles into Jacksonville, Florida. I take each in turn.

As to the annual reports and company profiles, Triche relies on Mazda Japan's stated goal "to develop a new marketing strategy that is adapted to

41

the characteristics of the US market, which is crucial for Mazda, in order to build a sales system with the goal set at 400,000 units for 2021," and a statement from the President and CEO of Mazda Japan that "Mazda sells vehicles in more than 130 countries and regions, and has production sites in seven countries around the world. . . . [W]e will also share management policies across all Mazda Group companies and continue developing an environment that encourages mutual learning to help further improve our brand value . . . ." But these national and global marketing, sales, and management pronouncements do not show that Mazda Japan purposefully directed or targeted its efforts toward Florida. It is Mazda Japan's connection to *Florida* that matters. See Walden, 571 U.S. at 284 ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."); J. McIntyre Mach., Ltd., 564 U.S at 886 (plurality op.) (stating that "it is petitioner's purposeful contacts with New Jersey, not with the United States, that alone are relevant" and concluding petitioner did not engage in conduct purposefully directed at New Jersey where facts showed "an intent to serve the U.S. market, but they do not show that J. McIntyre purposefully availed itself of the New Jersey market"); Kellogg–Borchardt v. Mazda Motor Corp., No. 1:18-cv-01105-JHR-KK, 2019 WL 2189527, at *4 (D.N.M. May 21, 2019)

42

(rejecting plaintiffs' assertion Mazda Japan's 2018 annual report and a 2017 report in brief showed Mazda Japan "actively engaging the national market in each state, including New Mexico" and engaging in "advertising in New Mexico and marketing its products through dealers who have agreed to serve as sales agents in New Mexico" because reports "do not indicate whether [Mazda Japan] plays any role in *directing marketing to particular states*" (emphasis added)).

Likewise, the fact that Mazda Japan owns various marketing trademarks registered with the U.S. Patent and Trademark Office does not show purposeful availment, because none of the trademarked phrases are directed specifically toward the Florida market.  While the plurality opinion in Asahi identified "designing the product for the market in the forum State" as an action directed toward the forum state, 480 U.S. at 112, the fact that Mazda Japan designs vehicles in accordance with U.S. regulations does not show a "substantial connection" between Mazda Japan and Florida.  See Burger King Corp., 471 U.S. at 475 ("Jurisdiction is proper . . . where the contacts proximately result from actions by the defendant . . . that create a 'substantial connection' with the forum State.").  This is because "[h]ere, the question concerns the authority of a [Florida] state court to exercise jurisdiction, so it is [Mazda Japan]'s purposeful contacts with [Florida], not

43

with the United States, that alone are relevant." J. McIntyre Mach., Ltd., 564 U.S. at 886 (plurality op.). For this reason, Mazda Japan's admission that "vehicles designed by [Mazda Japan], which are intended to for the United States market, including Florida, are designed to comply with U.S. regulations" is not the determinative factor for minimum contacts that the majority and concurrence want it to be. I also find the fact that Mazda Japan displayed a concept car (designed as a sofa) and bicycle in the lobby of a Miami Beach hotel for two days during the 2015 Art Basel exhibition, in order to showcase design, insufficient to show an intent to target the Florida market.

Mazda Japan also acknowledges that Mazda North America is the authorized distributor for Mazda vehicles in the United States. On this record, that fact does not constitute an action purposefully directed toward Florida. Yamashina attested that: Mazda Japan had no control over the distribution of the vehicle within the United States; Mazda Japan is not involved in Mazda North America's decisions about where to distribute the vehicles it purchases from Mazda Japan; and Mazda Japan does not advise Mazda North America into which states vehicles should be distributed. In response, the annual reports and company profiles relied upon by Triche to support jurisdiction do not show that Mazda Japan directs the distribution of

44

vehicles once sold to Mazda North America, and certainly does not reveal that Mazda Japan directs distribution of vehicles to any particular submarket or state, like Florida. In short, the fact that Mazda North America is Mazda Japan's authorized American distributor does not establish Florida jurisdiction in the absence of any evidence demonstrating relevant *control* or *direction* from Mazda Japan.[15] See Ditter v. Subaru Corp., No. 20-cv-02908-PAB-MEH, 2022 WL 889102, at *9 (D. Colo. Mar. 25, 2022) (finding plaintiff did not establish foreign manufacturer purposefully directed its activities at forum state where manufacturer's wholly-owned American subsidiary controlled the distribution and sale of vehicles in the United States, including the forum state; "[T]he creation of a global, or even nationwide, distribution system is insufficient, standing alone, to demonstrate minimum contacts with [the forum state].") ; Fischer v. BMW of N. Am., 376 F. Supp. 3d 1178, 1185–87 (D. Colo. 2019) (granting German car manufacturer's motion to dismiss for lack of personal jurisdiction even though manufacturer's subsidiary and

---

[15] Without record analysis, the concurrence concludes that Mazda North America's distribution efforts show that Mazda Japan "indirectly" serves the Florida market. On this point, the concurrence misplaces its dependence on Ford Motor Co. Again, in Ford Motor Co., Ford did not contest that it "actively seeks to serve" the relevant states' markets. 141 S. Ct. at 1026. More importantly, the majority opinion in Ford Motor Co. contains no discussion on the role of a domestic subsidiary in determining whether a global foreign corporation itself "deliberately extended" its business into a state's forum. Id. at 1027.

exclusive United States distributor "had voluminous sales in the United States" because "plaintiff has offered no allegations or evidence that defendant specifically targeted [the forum state] with its distribution efforts"); cf. Opheim v. Aktiengesellschaft, No. CV2002483KMESK, 2021 WL 2621689, at *3–4 (D.N.J. June 25, 2021) (denying without prejudice German car manufacturer's motion to dismiss for lack of personal jurisdiction because importer agreement between German manufacturer and American subsidiary indicated that "Audi AG does not simply ship a lump number of cars to VW America to then distribute in the United States independently. . . . Audi AG effectively ships its products to specific markets within the US," and thus forum-specific facts could exist); Lewis v. Mercedes-Benz USA, LLC, 530 F. Supp. 3d 1183, 1237–39 (S.D. Fla. 2021) (finding purposeful availment where there were *uncontradicted* allegations German car manufacturer defendant directed distribution and sales of its vehicles to Florida through control of American subsidiary, and general distributor agreement gave German company "the right to control nearly every aspect of [American subsidiary's] operations, including the sales and marketing" of relevant vehicles).

Triche also relies on Mazda Japan's admission that it makes decisions about defects and recalls of vehicles in the United States, and that "when a

46

recall of a Mazda vehicle is warranted, Mazda Japan directs Mazda North America to submit the required information [to the] NHTSA." The subject car was included in two recalls—one for a potentially inoperative parking brake and another for defective windshield wiper relays.[16] Mazda Japan provided the replacement parts for the windshield wiper recall to Mazda North America, but not for the brake recall. Mazda North America then distributed the windshield wiper parts to authorized dealers in the United States. Additionally, Mazda North America, on behalf of Mazda Japan, notified the NHTSA that it was implementing a limited regional recall in Florida, Hawaii, and Puerto Rico for vehicles with Takata Corporation airbags. A letter from the NHTSA to Mazda North America acknowledged the limited regional recall. The record also contains letters from Mazda North America to dealership managers and vehicle owners addressing the airbag recall; the letters did not come from Mazda Japan.

This evidence is insufficient to establish Mazda Japan purposefully availed itself of conducting activities in Florida. Triche does not point to any evidence showing that Mazda Japan is involved with the recall process in Florida after it decides a recall is warranted and instructs Mazda North

---

[16] At this point in the litigation, Triche does not assert that the recalls specific to the vehicle model are related to the design defect at issue.

America to notify the NHTSA. Although Mazda Japan provided wiper parts for the windshield wiper repair, the parts were provided to Mazda North America and were not sent directly to dealers or vehicle owners in Florida. The fact that Mazda Japan's limited regional recall for Takata airbags included Florida shows no more than that Mazda Japan was aware some of the relevant vehicles were in Florida. But mere foreseeability that a product could be in the forum state is not enough to establish purposeful availment of the forum state's market. In short, on this record, Mazda Japan's singular decision to recall vehicles and the fact that it provided parts to Mazda North America for one recall are not conduct purposefully directed toward Florida. See J. McIntyre Mach., Ltd., 564 U.S. at 886; S. Wall Prods., 251 So. 3d at 940.

Finally, Triche asserts that the most compelling evidence Mazda Japan targeted Florida is the fact that Mazda Japan "shipped" vehicles to the Port of Jacksonville, Florida.[17] In support of this contention, Triche relies upon the Bonenfant affidavit. Attached to that affidavit is a compilation of data

---

[17] While admitting it knows that Mazda North America distributes vehicles to Mazda dealers in Florida, in jurisdictional requests for admissions Mazda Japan denied that it "has shipped Mazda vehicles to Jacksonville Port Authority, Port Miami, and Port Everglades every year from 2006 through 2020."

48

showing shipments of vehicles from various "Mazda entities to any Florida port from November 1, 2006 to September 10, 2020." Mazda Japan acknowledges that the overall data shows 493 vehicles were offloaded at the Port of Jacksonville. Triche subsequently narrowed its presentation to the trial court to rely on data identifying Mazda Japan as the "shipper" of vehicles to the Port of Jacksonville, Florida, during 2016-2017. However, based upon my review of Bonenfant's affidavit and attached customs data, I cannot agree with the majority's finding that Mazda Japan targeted the Florida market by shipping and directing the distribution of its vehicles here.

The fact that Mazda Japan is identified as the "shipper" in customs data does not indicate that Mazda Japan determined either that vehicles would be offloaded at the Port of Jacksonville or distributed throughout Florida. Mere foreseeability on the part of Mazda Japan that vehicles would end up in Florida "is not enough by itself, to allow that state to constitutionally exercise jurisdiction over an out-of-state defendant." Highland Stucco, 259 So. 3d at 950. Indeed, Bonenfant's affidavit proves no more. Bonenfant states in her affidavit that the company identified as "[c]onsignee," here, Mazda North America, "represents '[t]he company importing the shipment into *the U.S.*" and a "[s]hipper," here, Mazda Japan, is an "overseas company exporting the shipment *to the U.S.*" (emphasis added). See Far East Mach.

49

Co. v. Aranzamendi, No. 05-21-00267-CV, 2022 WL 4180472, at *6 (Tex. App.–Dallas Sept. 13, 2022) (finding "the mere fact that up to eleven percent of [the Taiwanese steel pipe manufacturer]'s annual production was shipped to the Port of Houston is not evidence of actions in Texas or actions targeting Texas. Mere knowledge that Texas was the intended destination of the pipe is insufficient to subject [the Taiwanese manufacturer] to personal jurisdiction without evidence that it 'took additional steps to serve the Texas Market.'" (quoting Luciano v. SprayFoamPolymers.com, LLC, 625 S.W.3d 1, 13 (Tex. 2021))).

Additionally, as to the vehicle, Yamashina testified in his second affidavit that it was "sold to [Mazda North America] in Mexico and shipped to the United States f.o.b. Mexico," and that "Mazda North America imported the . . . Vehicle into the United States and distributed the . . . Vehicle to an independent dealer." Triche presented no contrary evidence. Because the vehicle was shipped "f.o.b. Mexico," title to the vehicle and risk of loss passed to Mazda North America in Mexico. See Jacobson v. Neuensorger Korbwaren–Indus. Friedrich Kretz., K.–G., 109 So. 2d 612, 614 (Fla. 3d DCA 1959) ("The provision of the contract for sale of the merchandise stating the price and providing 'f.o.b. Hamburg order Bremen' resulted in title to the goods passing to the purchaser at that point of shipment (Hamburg). . . .

50

From that point, and during the balance of the journey, the risk of loss was on the purchaser." (citations omitted)); Charia v. Cigarette Racing Team, Inc., 583 F.2d 184, 188 (5th Cir.1978) (stating that "[s]hipment 'FOB Florida' simply means that title to the goods and the risk of their loss passed to Charia in Florida, and Charia bore the cost of shipping from Florida to Louisiana"). While the fact that title and risk of loss passed to Mazda North America in Mexico alone may not show that Mazda Japan lacks a substantial connection with Florida, it is also true that *nothing in this record shows that Mazda Japan directed that the vehicle be offloaded at the Port of Jacksonville, or anywhere in Florida*. Nor does the record show that Mazda Japan determined the vehicle's distribution within Florida. Thus, the Bonenfant affidavit and attached customs data do not prove that Mazda Japan directed or targeted its activities toward Florida.

## CONCLUSION

At its core, "[d]ue process limits on the State's adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of the plaintiffs or third parties." Walden, 571 U.S. at 284. After grappling with the record before us, I am confronted with insufficient evidence that Mazda Japan directed or targeted its activities toward Florida such that it has purposefully availed itself of the privilege of conducting

51

business here.  Accordingly, I would find that Mazda Japan lacks sufficient minimum contacts with Florida to satisfy the due process protections afforded to nonresident defendants, reverse the order denying Mazda Japan's motion to dismiss for lack of personal jurisdiction, and remand with instructions to dismiss Mazda Japan from the action.